## SAN JOAQUIN & KINGS RIVER CANAL & IRRIGATION CO., Inc., v. STANISLAUS COUNTY et al.

### (Circuit Court, N. D. California.  September 18, 1911.)

### No. 14,554.

1. EQUITY (§ 409*)— QUESTIONS OF FACT—PRESUMPTION IN FAVOR OF FINDINGS OF MASTER.

In a suit to enjoin the enforcement of water rates to be charged by an irrigation company fixed by a county board under legislative authority as confiscatory and in violation of the constitutional rights of the company, the court is required to exercise its own unfettered judgment upon all material questions of fact and law, and the rule in ordinary cases as to the presumption in favor of findings of fact by the master does not prevail.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 905–923; Dec. Dig. § 409.*]

2. WATERS AND WATER COURSES (§ 257*)—REASONABLENESS OF WATER RATES FIXED BY PUBLIC AUTHORITY—VALUATION OF PLANT.

In ascertaining the value of a large irrigation plant for the purpose of determining the reasonableness of water rates fixed by public authority to be charged for service from such plant, as fair a rule as can be formulated is to find the cost of reproduction as of the date of the use in question, and deduct therefrom the depreciation that has resulted from age and use.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 257.*]

3. WATERS AND WATER COURSES (§ 257*)—STATE REGULATION OF CHARGES BY IRRIGATION COMPANY—REASONABLENESS OF RATES—VALUATION OF PROPERTY.

Complainant, an irrigation company, brought suit to enjoin the enforcement, on the ground that they were confiscatory and in violation of complainant's constitutional rights, of water rates fixed for its service by the boards of supervisors of the counties through which its canals extended under Act Cal. March 12, 1885 (St. 1885, p. 95), which authorized such boards to estimate the value of all property actually used and useful to the appropriation and furnishing of such water and the reasonable annual expense of the service, and to fix such rates that the net annual profits of the company should be not less than 6 nor more than 18 per cent. upon the value of the property actually used and useful. *Held,* that the estimate of the master of the value of the physical property of complainant actually used was made upon a proper basis and was supported by the evidence; that his finding as to the annual expense of the service was also supported by the evidence, and should be confirmed, but that complainant was entitled to have added thereto, to be deducted from its

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

gross income, an allowance on account of depreciation of its plant in addition to the cost of current repairs.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 257.*]

4 WATERS AND WATER COURSES (§ 257*)—STATE REGULATION OF CHARGES BY IRRIGATION COMPANY—VALUATION OF PROPERTY—WATER RIGHTS.

Under the Constitution and laws of California which declare the use of the waters of the state appropriated for sale, rental, or distribution to be a public use, and the right to collect compensation therefor a franchise subject to regulation by law, an irrigation company diverting water from a stream for distribution through its canals is merely an intermediate agency between the public, which is the owner of the water, and the owners of the land to which it is applied, who are the real appropriators and owners of the water right, which runs with the land, and is based upon and measured and limited by the beneficial use made of the water. The company has no property in the water or the water right, aside from its franchise, to distribute and collect compensation therefor which a county board is required to consider in estimating the value of its property as a basis for fixing rates to be charged consumers, under Act Cal. March 12, 1885 (St. 1885, p. 95), but is entitled to have its franchise valued.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 257.*]

In Equity. Suit by the San Joaquin & Kings River Canal & Irrigation Company against the counties of Stanislaus, Merced, and Fresno, Cal. Decree for defendants.

See, also, 163 Fed. 567; 191 Fed. 898.

Action to enjoin the enforcement of certain water rates established by the boards of supervisors of the counties of Stanislaus, Merced, and Fresno, in the state of California, to be charged by the complainant as owner of certain canals and other works of a water distributing system for water furnished to consumers, and to declare said rates null and void on the ground that they and each of them are so low as to deprive complainant of its property without due process of law, and without just compensation.

Garret W. McEnerney, Frank H. Short, and Edward F. Treadwell, for complainant.

Maddux & Maddux, Denver S. Church, M. F. McCormick, H. S. Schaffer, and J. P. Langhorne, for defendants.

MORROW, Circuit Judge. The complainant is a corporation organized and existing under the laws of the state of Nevada, and is the successor in interest of a corporation of substantially the same name organized under the laws of the state of California, which former corporation for more than 30 years next preceding the 14th day of June, 1905, was engaged in furnishing water for irrigation, sale, rental, and distribution to the inhabitants of the counties of Fresno, Merced, and Stanislaus. This former corporation on the 14th day of June, 1905, for a valuable consideration, transferred to the complainant all its canals, works, and property, and all the water appropriated by it, and all its right to appropriate water, together with all its property and business connected therewith.

The present controversy between the complainant and the counties of Stanislaus, Merced, and Fresno is substantially the continuation of a controversy between the complainant's predecessor and the county of Stanislaus alone, which was before this court in San Joaquin & K. R. Canal & Irr. Co. v. Stanislaus County (C. C.) 90 Fed. 516, and 113 Fed. (C. C.) 930, and which reached the Supreme Court, and is reported in Stanislaus County v. San Joaquin & King's River Canal & Irr. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406. This former case related to certain maximum water rates fixed by the board of supervisors of Stanislaus county to be charged annually by the complainant in that case after June 24, 1896. The present case relates to certain maximum water rates fixed by the boards of supervisors of Stanislaus, Merced, and Fresno counties to be charged annually by the complainant in this case after the 1st day of July, 1907. Complainant alleges in its complaint that it owns and maintains a system of canals and works for the diversion, carrying, and distributing of water from San Joaquin river and Kings river, and their tributaries, from Tulare Lake and streams flowing thereinto; that said canals and works head on the San Joaquin river at its junction with the Fresno slough, in the county of Fresno, and thence running through the counties of Fresno and Merced to and into the county of Stanislaus; that the canals and works actually used and useful in furnishing water to the inhabitants of said counties are of the value of more than $1,132,514.85; that complainant is the owner of the right to divert from the said San Joaquin river and into said canals not less than 760 cubic feet per second, when there is so much water flowing in said river at complainant's headgates, and, when less than that quantity is there flowing, then all the water then flowing in said river; that the said right to divert said water and to sell and distribute the same is the property of the complainant, and is of the value of not less than $760,000, exclusive of and apart from the value of the canals and works.

The act of the Legislature of the state approved March 12, 1885 (Stats. 1885, p. 95), is referred to in the complaint. It provides in section 1 that the use of all water now appropriated or that may thereafter be appropriated for irrigation, sale, rental, or distribution is a public use, and the right to collect rates or compensation for the use of such water is a franchise, and except when so furnished to any city, city and county or town, or the inhabitants thereof, shall be regulated and controlled in the counties of the state by the several boards of supervisors thereof in the manner prescribed in the act. In section 4 it is provided that the boards of supervisors shall estimate as near as may be the value of the canals, ditches, flumes, water chutes and all other property actually used and useful to the appropriation and furnishing of such water belonging to and possessed by the person, association, company, or corporation whose franchise shall be so regulated and controlled, and shall in like manner estimate the annual reasonable expenses, including the cost of repairs, management, and operating such works. Upon these estimates the boards of supervisors are authorized and required by section 2 of the act to fix and regulate the maximum rates at which water may be

sold, rented, or distributed. By section 5 of the act the boards of supervisors are required in fixing such rates to so adjust them that the net annual receipts, and profits thereof shall not be less than 6 nor more than 18 per cent. of the value of the canals, ditches, flumes, chutes, and all other property actually used and useful to the appropriation and furnishing of such water. It is further provided that in fixing said water rates the boards of supervisors may likewise take into consideration any and all other facts, circumstances, and conditions pertaining thereto, to the end and purpose that said rates shall be equal, reasonable, and just, both to such persons, companies, associations, and corporations and said inhabitants.

It is alleged in the complaint that in May and June, 1907, the boards of supervisors of the counties of Stanislaus, Merced, and Fresno, in assumed compliance with the said act of the Legislature, estimated the value of the canals, ditches, flumes, and other property actually used by complainant and useful to the appropriation and furnishing of its appropriated water to the inhabitants of the respective counties, and at the same time the boards of supervisors estimated the annual reasonable expenses, including the cost of repairs, management, and operating the said works so far as relates to each of said counties, and fixed the maximum rates for each and every kind of irrigation here tabulated as follows:

| County. | Value of Property. | Annual Expenses. | Maximum rate fixed per year. |
| --- | --- | --- | --- |
| Stanislaus | $335,456.32 | $35,000 | $1.50 |
| Merced | 750,000.00 | 37,000 | 1.65 |
| Fresno | 116.250.00 | 21,750 | .85 |

It is alleged: That the greatest area for the irrigation for which complainant or its predecessor has ever furnished, or has been called upon to furnish, water in said counties, is 103,980 acres, as follows:

Stanislaus county...................................... 11,673 acres
Merced county.......................................... 52,379 "
Fresno county......................................... 39,928 "

Total ...............................................103,980 acres

That there is no reason to expect or believe that said areas or either of them will, or can, be increased for several years.

The income from complainant's property in these three counties, based upon the area stated and the rates fixed by the boards of supervisors, would be as follows: In Stanislaus county, 11,673 acres at $1.50, $17,509.50; in Merced county, 52,379 acres at $1.65, $86,425.35; in Fresno county, 39,928 acres at $.85, $33,938.80—$137,873.65.

It is alleged that the rates so attempted to be fixed by the said boards of supervisors are grossly unfair and unreasonable, and such that the net annual receipts and profits thereof to the complainant for waters furnished to the inhabitants of the said counties cannot possibly amount to 6 per cent., nor to any per cent., upon the amount so estimated by said board to be the value of complainant's said property actually used and useful in the appropriation and furnishing of said

water to the inhabitants of said counties; and would not even repay to the complainant one-half of its annual reasonable expenses as established by said board, nor will it allow or permit the complainant to receive any just and reasonable compensation for the property used by the complainant and useful to the furnishing of water to the inhabitants of said counties.

Upon filing the bill of complaint, supported by affidavits, and after hearing upon an order to show cause, this court directed that a temporary injunction issue as prayed for in the complaint, enjoining the boards of supervisors in the counties named from enforcing the maximum rates fixed by them as before stated. San Joaquin & King R. C. & I. Co. v. Stanislaus County (C. C.) 163 Fed. 568. Subsequently, the cause being at issue, it was referred to Hon. E. H. Heacock, the standing master in chancery of this court, to hear and report his findings of facts and conclusions of law in the case. The master has heard the testimony, and upon such testimony has made an elaborate and carefully prepared report, dealing with all the questions of fact and law in the case in a clear and comprehensive manner. The patience and industry of the master in the performance of this work are highly commended by all the parties to the controversy. The court joins in this commendation. The able and searching work of the master has removed from the case many matters of detail which have been accepted by all parties as satisfactory and requiring no further consideration by the court.

[1] The court has therefore been relieved of much labor as the questions at issue have been reduced in scope and character; but the main and controlling questions still remain to be determined. The presumption in favor of the master's report as contended for by the defendants is admitted as the rule in an ordinary case in equity, but we are advised by the Supreme Court that in a case of this character we should not fetter our discretion or judgment by any artificial rules as to the weight of the master's findings, however useful and well settled these rules may be in ordinary litigation. Knoxville v. Water Co., 212 U. S. 1, 8, 29 Sup. Ct. 148, 53 L. Ed. 371. We must therefore give the testimony and the questions involved an independent examination, and to these questions we will now direct our attention.

The master found from the testimony that the actual value of the property used by the complainant and useful in the appropriation and furnishing of water to the consumers under complainant's irrigation system was $896,829.55, and that the net annual income which the complainant should have received was $69,094.41. It was found, further, that this net income was the equivalent of 7.704 per cent. The statute provides that the rates fixed by the boards of supervisors for the services mentioned shall be so adjusted that the net annual receipts and profits to the associations, companies, or corporations furnishing water shall be not less than 6 nor more than 18 per cent. If the findings of the master are correct as to the value of complainant's property and the income derived therefrom, it follows that the complainant's income was more than the minimum fixed by the statute, and upon this basis the complainant has no cause of action and the bill should be dismissed. Whether the value of complainant's

plant as found by the master is correct is the controlling question now submitted to the court for determination.

The question is one of great difficulty. There is no ascertainable market value for a plant such as is owned by the complainant in this case. If it were offered for sale, it would only command a price based upon the annual return which the plant would yield upon the investment, and the reasonable certainty of its continuance. If by reason of regulation of rates by a board of supervisors or other regulating body the rates are uncertain and the return problematical, the value of the plant would be correspondingly depreciated. If, on the other hand, the rates are fixed and reasonably commensurate and certain for the service rendered, with the probability that they would be continued and a suitable return secured on the investment in the future. the value of the plant would be correspondingly increased. Then there are other questions which enter into the value of such a plant if it were offered for sale, as, for instance, whether the plant is an economical system, rendering an efficient and satisfactory service in the distribution of water to the consumers, whether the lands to be irrigated are of the quality to make irrigation profitable and certain, and, generally, whether all the conditions are favorable for the business of distributing water in the locality where the plant is established.

Mr. Wiel in his work on Water Rights in the Western States (3d Ed.) § 1305, speaking upon this subject, says:

"Strictly speaking, it would appear that a great water plant has no fixed value; for value can be measured only by some standard accepted by custom, such as an open market, or what a thing brings on a sale, which is its price, or value measured in gold. Great distributing plants are so rarely sold that there is no such standard of measurement. There is no open market for such things. The only way in figuring in money the value of a thing having no sale-market, and in its nature fixed and permanently bound in with its surroundings, is upon the money return which it brings in, comparing that return with the return received from things which do have a market value; that is, the measurable value of such a plant lies in the rates it can collect, and to attempt to fix rates upon its value (which depends upon the rates) is hence proceeding to a considerable degree in a circle. The result is that the determination of a value on which to figure the return must be more or less arbitrary. It becomes considerably a matter of establishing some empirical formula by experiment."

The situation is one of great embarrassment to the courts called upon to examine the reasonableness of rates fixed by public boards, but this much has been determined:

"What the company is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public." San Diego Land Co. v. National City, 174 U. S. 739, 757, 19 Sup. Ct. 804, 811, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 442, 23 Sup. Ct. 571, 47 L. Ed. 892; Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 29 Sup. Ct. 192, 53 L. Ed. 382.

It has been determined, further, that:

"The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company, but the test would lead to obviously incorrect results, if the cost of reproduction is not diminished by the depreciation which has come from age and use." Knoxville v. Water Co., 212 U. S. 1, 2, 29 Sup. Ct. 148, 150, 53 L. Ed. 371.

[2] We then have this rule for ascertaining the value of a plant of the character of that owned by the complainant in this case:  Find the cost of reproduction as of the date of the use in question, and then from this cost deduct the depreciation that has occurred from age and usage.

[3] Turning now to the master's report, we find that he has proceeded upon this rule for the purpose of determining the value of the plant and has made the examination in detail, making the aggregate as near as possible the cost of reproducing complainant's canal system as of the date of July 1, 1907, when the rates in controversy took effect.  The complainant claimed that the cost of reproducting the structures was the sum of $420,866.87.  After a careful examination of the testimony upon this claim, the master found that the estimate was 25 per cent. too high, and determined that the estimated cost of reproduction would be $315,515.14.  The master further found that the depreciation on the present structures had been 30 per cent., or $94,654.54, which, being deducted from $315,515.14, leaves the value of the structures as of July 1, 1907, $220,860.60.  This last appears to be a large reduction for depreciation, but with a suitable allowance from annual earnings to keep the property from further depreciation the finding will be sustained.

The complainant claimed that the cost of reproducing the earthwork of its canals would be $575,730.95.  The cost was based upon the estimate that the canals had required the excavation of 5,367,765 cubic yards of earth.  The complainant estimated that the cost of excavation would be 10.725 cents per cubic yard, making a total cost of $575,730.95.  The defendants estimated that the canals required the excavation of 4,679,760 cubic yards of earth, and introduced testimony tending to show that the work of excavation could be made at a cost of 5.5 cents per cubic yard, making a total of $257,386.80.  The testimony showed that the cost of excavation turned largely upon the appliances used.  The complainant's estimate was based upon the cost of doing the work entirely by scrapers, and that of the defendants was based upon doing the work by means of modern excavating machinery.  There was evidence tending to show that the combination of excavators and scrapers would be required in digging complainant's canals, and the master found accordingly, and fixed the cost of excavation at 8 cents per cubic yard.  The master accepted complainant's estimate as to the amount of earth required to be excavated, to wit, 5,367.765 cubic yards.  The removal of this quantity of earth at a cost of 8 cents per cubic yard would be $429,421.20.  The cost found by the master was $429,425.28.  The difference between these two amounts is immaterial.  This estimate appears to be reasonable, and the finding is sustained.

The complainant claimed that the earthwork had appreciated in value in the sum of $129,365, and that this sum should be added to the cost of reproduction.  The master refused to allow this claim.  His reasons for so doing cannot be better stated than as set forth in his report.  He says:

"Complainant also claims that the earthwork had actually appreciated in value, effectiveness, and earning power by the lapse of time, by reason of the

packing of the banks and the silting of the canals, thus avoiding breaks and preventing loss of water by seepage. The only witness produced by complainant to show the value of such alleged appreciation is Mr. Hammett, complainant's engineer. The testimony is somewhat lengthy on this point. I shall endeavor to state Mr. Hammett's theory of the alleged appreciation and his method of computing its valuation. He advances the proposition that a newly built canal is less effective than an old canal by reason of the greater amount of seepage and loss of water than a new canal, due to the looseness of the soil, due to the banks not being compacted, and causing washouts and 'blowouts,' as it is called, making a new canal rather precarious of operation; that, after it has been operated a few years, it gets in condition; that it stays about the same from year to year, caused by the fact that the walls and the floor settle, and the silting, so that both seepage and leakage from the gates are largely stopped; that, in order to make his estimate, it is necessary for him to estimate the loss of water by such seepage in a new canal and to calculate the total seepage and evaporation. He further testified as follows:

"'Q. Have you given attention to the amount of loss from seepage and evaporation in canals? A. I have in a general way, but I have been unable to get accurate figures on them. Figures are very hard to get, due to people wanting to get water through, and not caring much about the measurements.

"'Q. But have you experimented yourself in order to determine the amount of loss by seepage and evaporation in canals, new and old, and otherwise? A. I have with old canals, but, as I say, on new canals I have been unable to get figures, except in a general way because we have no new canals of our own, and, with other people's canals, they do not seem to care much about the figures; and so it is impossible to get accurate figures from them. They do, however, state that the loss is in a general way so much, but there is nothing accurate in those figures.

"'Q. Well, irrespective of the exact figures, are you able to approximate the difference in loss between a new canal and a well-silted canal from the experience you have had? A. I am able to assume it at a quantity which I am sure is less than the actual quantity. That is the best I can do. * * *

"'Q. What examination, if any, have you made of the canals of complainant in order to determine the amount of actual seepage and evaporation in the complainant's system of canals, as they now exist and during the year 1907–08? A. In August, 1907, I had measurements taken over the whole San Joaquin system, and determined the amount of loss of water during a short period during that month. A period of seven days, in fact, was all that I was able to collect proper figures on, due to the inexperience of the men that I had at work on it. So I had to throw out the first two weeks of their work, and the third week they got in figures which could be taken. Then, in 1908, I had continuous measurements taken from the 1st of July until the last of August, to determine the exact amount of loss from seepage and evaporation.'

"He then states that he has computed this loss, and that 33.1 per cent. of the total intake was lost by seepage and evaporation.

"'Q. Now, you stated that your experience permitted you to come to at least a minimum amount that would be lost in a new canal, and for the first few years of its construction. Will you please state what that experience has been in that regard, and what is the amount of loss in a new canal as compared with this canal? A. My knowledge of that is mainly from observation of a few small, new ditches, and of hearsay in regard to actual canals where water has run in on new canals. For instance, we have at the end of our southside canal a realty ditch which was put in during the past year, and we know how much water per acre it took in that ditch to irrigate. We know that that was about six or eight times the amount that it takes per acre to irrigate under our own canal. Therefore we assume that the extra quantity of water was lost in the canal, due to its being a new canal. It would be probably about five times the amount that is being lost per mile in our own canal. Then I have been told by people who were connected with the canal system—the San Joaquin system—that at the time when the extension of the canal was made from Los Banos creek to Orestimba creek that between 400 and 500 second feet were turned into that canal first in attempting to take it to the Orestimba creek, and that very little of the water reached Orestimba

creek; that is, that the loss for that—about 30 miles—was about 400 second feet for 30 miles. * * *

" 'Q. Take this entire canal system, what would be your opinion as to the amount that it would lose on the average during the years before it got into what you might call a perfect condition? * * * A. I should say that it would lose three times as much at the start as it would after, say, eight years or so, and that after eight years or so it would practically be silted, so that the loss would be very little more than it would be after any succeeding number of years.'

"He then states his method of computation as follows: 'A. The theory that I went on was this: That if the canal was constructed anew that there would be a very much increased quantity of water lost in that canal in the first few years, as I have stated. The canal is entitled to a certain quantity of water. We have takers for all that water, and therefore the second feet lost during this few years while the canal was silting up is an actual loss in dollars and cents. I consider that loss as a block amount equal; that is, that the loss on one year, the present loss in one year—that is, the increased loss because of the canal being new—over this eight years, would be equal to six times the present loss in one year. This is due to the fact that at first the first year it would be three times as much, but the second year it would be very much smaller; that is, the change in loss for that eight years would not run in a straight line, but would run in a curve approaching the horizontal, that at the end of eight years the loss would be the same from year to year, and that the total loss of those eight years would amount to, as I say, a block amount equal to six times the present amount in one year. That amount would be approximately 125,000 second feet for 24 hours. I give this a value equal to the value per second feet of every second foot which we sold during the past season, 1907–1908. This average amount received for every second foot that we sold was $1.05 per second foot for 24 hours, which made the value of this 125,000 second feet of excess loss due to a new canal to be worth $125,250. * * *

" 'XQ. You never had occasion before this (his employment by complainant) to estimate the loss of water by seepage or evaporation in an irrigation canal under conditions exhibiting the same climate and the same or similar soil to that obtaining in complainant's canal, had you? A. I had not. * * *

" 'Q. Well, you never had any experience in making those measurements before, had you? A. I had never had experience in making those measurements before.'

"As heretofore stated, Mr. Hammett entered into complainant's employ in the year 1907. The total amount of the appreciation claimed is shown by Complainant's Exhibit No. 26, which is Mr. Hammett's calculation of depreciation of structures and appreciation in earthwork, such appreciation in earthwork being $129,365. Defendants deny the theory of appreciation of earthworks and its application, and contend that no such alleged appreciation of earthworks is proper in arriving at the present value of the canal, for the reason stated by Mr. Henderson (a witness on behalf of the defendants) in his testimony. In reply to the question, 'I ask you whether, in your opinion, any sum of money should be added to the value of these canals on account of or as representing in any way the loss of any water by seepage?' he answered: 'If the valuation of the canal should be increased in regard to its cost or in regard to the value by the silting up of the canal to the extent of preventing further percolation, I should not think so, inasmuch as in the design of the canal it is one of the elements necessary to have the canal sufficient to allow for seepage and evaporation in order to irrigate a certain area, and in the construction of the canal to irrigate a given number of acres due consideration is given to that part of it, and therefore it follows that the original cost of the canal covered the feature of seepage, and that afterwards, if the seepage is reduced, it would simply give a greater earning capacity of the canal on the same investment.'

"In determining the question of present value, the method which has been followed, and which is conceded by both parties to be the proper method, was to establish the present cost of reconstructing the physical structures and earthworks of complainant's canal, together with such properties as might be

incident thereto. This method I have followed, as appears from the foregoing estimates. Having ascertained such cost of reproduction, the question is presented, In what respects is the canal at the 'time of the application of the rates in question more or less valuable than such newly constructed canal? For the purpose of ascertaining such present value, it is admitted that the extent to which the canal has depreciated should be deducted from such estimated cost of reconstruction. Likewise, it would seem to me that if by reason of a lessened amount of percolation the canals of complainant in their present condition are capable of delivering more water, thereby producing greater revenues to the company, it would be of more value than a canal estimated on the basis of the reconstruction figures aforesaid. From Mr. Henderson's statement that, if afterwards the seepage is reduced, it would simply give a greater earning capacity of the canal on the same investment, it seems to me that it would necessarily follow that the canals would be more valuable by reason of such increased earning capacity. This is, of course, assuming that the canal company in this instance would be able to sell the waters which would be represented by the increased capacity of the canal.

"The only testimony offered to establish the valuation of this alleged appreciation is that of Mr. Hammett. Mr. Goodwin (a witness on behalf of complainant) made no calculations of either appreciation or depreciation, as heretofore stated. In order to arrive at the increased carrying capacity of the canals by reason of the less amount of seepage that would exist in new canals, it was necessary for Mr. Hammett to ascertain, first, the amount of water lost by reason of seepage in the present condition of the canals; and, second, the amount of water that would be lost by seepage on the assumption that the canals were new. That Mr. Hammett as an engineer is competent to measure loss by seepage in the present canal I believe satisfactorily appears by reason of his qualifications as a hydraulic engineer, but it is equally important that he shall be competent to estimate the amount of seepage in the new canals, for without such an estimate no calculation as to the advantage of the present canals over the new canals could be made. The excerpts from the testimony above stated I am of opinion show that Mr. Hammett does not possess the necessary experience, and has failed to qualify as an expert witness to testify on the point of the seepage in new canals. To repeat his testimony, he found it impossible to get accurate figures on new canals; and his knowledge 'is mainly from observation of a few small, new ditches and of hearsay in regard to actual canals where water was run in' on new canals,' as well as other portions of the testimony quoted, shows to my mind that Mr. Hammett is not a competent witness on this point. The burden of proof in establishing the amount of such alleged appreciation is on the complainant, and complainant must establish the same by satisfactory evidence.

"I do not find that the evidence offered on this point is satisfactory. Aside from the unsatisfactory character of such evidence, it seems to me that, admitting that such canals have appreciated in value, the amount of such appreciation would be affected by certain elements of depreciation caused by the collection of berm in the canal, which has been testified to in this case, and also by silting of the canal, which necessitates an expense of cleaning. Complainant contends that there is at present very little silt in the canals. Mr. Goodwin testified in comparing the relative condition of the canal in 1906 and 1896, at which latter date he made an examination of the canal on behalf of the board of supervisors of Stanislaus county, that at the time of his examination in 1906 there was practically no silting at all, that the canal had practically had its cross-section restored. Complainant also calls attention to the fact that one of defendants' witnesses, D. M. Rouse, testified that, while he had not been over all the canal, some of it he had been over, and that he had done considerable work on it, cleaning it out, and that the canal is in better shape than it was a few years ago, and that there was no silt where he had seen. Mr. Rouse was formerly complainant's superintendent. Notwithstanding Mr. Goodwin's statement that there was practically no silt, which testimony referred to the time of his examination in 1906, I find that complainant has charged in its maintenance accounts for the year ending

June 30, 1908, the sum of $15,760.44 for canal cleaning, the largest amount appearing in any one year. * * *

"Defendants' witness Sloane has estimated in his report of complainant's properties a depreciation of earthworks by reason of silting to an amount of $30,000. I find that in Mr. Goodwin's report to the supervisors of Stanislaus county in 1896 he followed this method of deducting from the value of the earthworks an amount for depreciation by silting, as appears from the testimony in a certain excerpt taken from Mr. Goodwin's testimony before the board of supervisors of Stanislaus county. In reply to the question: 'Q. How much in your calculation of the depreciation of $51,000 between the cost of construction and the present value did you allow for the fact that the canal was silted?  A. I allowed the whole silting of the canal as 223,767 yards.  Q. How much did you estimate it would cost to clean that?  A. Ten cents.  Q. So that accounts for $22,376.70 of the $51,000 depreciation from the cost of construction to the present value.'

"Mr. Goodwin in the case at bar testified that both appreciation and depreciation were questions to be considered in the valuation of these properties. According to Mr. Hammett's theory, the canal would reach its maximum capacity in eight years.  The canals concerning which Mr. Goodwin testified before the supervisors in 1896 had been constructed for more than eight years prior to the time of giving his testimony, and had as fully appreciated in value as to the portions of the canal then existing as at the present day. Mr. Goodwin not only made no allowance for appreciation, but, as shown, deducted a sum for depreciation of the earthworks. It is true that complainant would not be bound by Mr. Goodwin's testimony given in such former proceeding, that it may not have urged this theory of appreciation at that time, or that, if the same was urged, Mr. Goodwin did not concede it. I cite this instance mainly for the purpose of showing that a deduction for depreciation of earthworks by silting should be made from the alleged appreciation.  Also, during the first eight years, which Mr. Hammett states is the time required to elapse before the seepage is normal, I take it little or no canal cleaning would be required, as the silting up of the canal to a certain extent is desirable in its early stages, silting reducing the seepage as testified to by Mr. Hammett.  As Mr. Hammett takes the total value of the water lost during these eight years as representing the increased value of the canals in their present condition, it seems to me he should deduct from the value of such water the cost of canal cleaning during a period of eight years, which is now required to keep the canals up to their normal efficiency.  In other words, if a new canal lost $100,000 worth of water in eight years, but needed no canal cleaning, and an old canal lost no water, but required $100,000 for canal cleaning, the revenue derived would be the same.  Complainant expended for canal cleaning and dredging from 1900 to 1908 $80,984.76.

"After a careful examination of all the testimony on this question, I find I am unable to make either a calculation as to appreciation or depreciation of the earthworks of the canal, and shall assume that the one offsets the other."

After carefully reading the testimony on this subject, I have reached the same conclusion the master did with respect to this claim.

The master found that the rights of ways for complainant's canals were of the value of $144,119.  To this finding no exception has been taken, but, in addition to this valuation, the complainant claimed before the master, and urges the claim here for the valuation for 286 miles of fences along the canals at a cost of $148.50 per mile, making $42,471.  The master rejected this claim for the reason that it was not supported by evidence.  There is no evidence in the record that the complainant built any fences along its right of way.  In complainant's brief before the master it is stated:

"That they were unable to prove that the company itself built these fences, but the books of the company refer to these fences as early as 1877.  If we

admit that the adjoining owners built the fences, still, if the canal company should fence its right of way, it would be liable for one-half of these fences. C. C. Cal. § 841. Undoubtedly a new company would be compelled to pay the cost of these fences if they attempted to condemn a right of way through this country."

The master held that the inquiry he was called upon to make was the cost of reproducing the plant at the time the rates in question were fixed, and that such cost of reproduction must be applied to the property that was owned by the complainant. He was of the opinion that if the fences had not been built by the complainant, and therefore did not belong to the complainant, it would not be entitled to have them valued as a part of its property. I see no reason for sustaining the exception to this finding.

The complainant claimed that a fair and reasonable estimate of the life of weirs, gates, bridges, buildings, and machinery and other perishable structures in complainant's plant was 33 years, that an annual allowance should be made for such depreciation, and, on the basis that reproduction of these structures would cost $420,866.87, it is claimed that an annual allowance should be made of $1/33$ of that sum, to wit, $12,748.08. The master found, as we have seen, that the cost of reproduction would be $315,515.14. He also found from the testimony that the average life of the structures was 33 years. Dividing $315,515.14 by 33 gives $9,561.06 as the average annual depreciation found by the master. Defendants objected to such an allowance on the ground that the complainant had entered in its maintenance account the expense incurred for repairs of structures, and that to allow complainant a sinking fund in addition would result in a double allowance for deterioration. The master was unable to distinguish between repairs and replacements in the maintenance account, and found the complainant at fault in not keeping a separate account for replacements, and accordingly made no specific allowance for depreciation. In doing this the master cites as authority the case of Knoxville v. Water Co., 212 U. S. 1, 13, 29 Sup. Ct. 148, 53 L. Ed. 371. In that case in estimating the value of the water company's plant large deductions were made on account of depreciation. These depreciations were divided into complete and incomplete depreciation. The complete depreciation represented that part of the original plant which through destruction or obsolescence had actually perished as useful property. The incomplete depreciation represented the impairment in value of the parts of the plant which remained in existence and were continued in use. It was urgently contended on the part of the water company that in fixing upon a valuation of the plant upon which the company was entitled to earn a reasonable return the amounts of complete and incomplete depreciation should be added to the present value of the surviving parts. The trial court refused to approve this method, and the Supreme Court thought the refusal was proper. That question is not involved in this case. There has been no addition of any amount on account of depreciation to the present value of the surviving parts, but, on the contrary, a deduction of $94,654.54 from the cost of reproduction has been made to find present value, and what the complainant now asks is to be allowed to do what the Su-

preme Court says it should do, namely, "earn a sufficient sum annually to provide, not only for current repairs, but for making good the depreciation and replacing of parts of the property when they come to the end of their life." The fact that the complainant has heretofore entered in its maintenance account expenditures for replacements ought not to deprive complainant of an allowance for depreciation in the future if the amount can be ascertained with reasonable accuracy by the method of computing the average annual depreciation as has been done in this case. The Supreme Court in the Knoxville Case said further:

"The company is not bound to see its property gradually waste, without making provision out of its earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stock holders, and, in the case of a public service corporation at least, its plain duty to the public."

It seems to me that $9,561.06, the amount estimated by the master as the annual depreciation of the plant, should be specifically allowed, that there may be a clear understanding that the depreciation of the plant is provided for and allowed out of the earnings that the value of the property may be kept unimpaired by use. It will then remain in estimating for the annual allowance for maintenance to separate annual repairs from expenses incurred for replacements to prevent depreciation. This may be a difficult task, as the master has found with respect to the maintenance account now before the court. The distinction between ordinary repairs and repairs made in substantial reconstruction of the plant may not be accurately drawn, but absolute accuracy is not required in such details. What is required is an estimate as near as may be of the value of the property, and an estimate as near as may be of the annual receipts and expenditures. The act of March 12, 1885, requires the boards of supervisors to estimate as near as may be the value of the canals, ditches, flumes, water chutes, and all other property of such corporations, and in fixing rates to so adjust them that as near as may be the net annual receipts and profits shall not be less than 6 nor more than 18 per cent. upon the estimated value, and in estimating such net receipts and profits the cost of any extensions, enlargements, or any permanent improvements is not to be included as part of the expenses of management, repairs, and operating of such works; but, when accomplished, may and shall be included in the present cost and cash value of such works. The question before the court is to determine whether the defendants in this case have made estimates in accordance with the requirements of the statute, and in so doing the revision must necessarily be also one by estimation.

Referring now to the maintenance account, we find that complainant's books show that for the year ending June 30, 1908, it amounted to $83,487.28. In estimating what this account should be for an average year, the master has made a number of deductions amounting in the aggregate to $16,372.44, leaving the amount to be deducted from complainant's gross income on account of maintenance the sum of

$67,114.84. For example, the maintenance account as it appears in complainant's books contains the charge for expenses incurred in cleaning the canals, $15,760.44. The master found that the average of this expense for the 10 years from 1900 to 1908 was $6,074.23. He has accordingly allowed this amount for maintenance for the year ending June 30, 1908, and not the sum of $15,760.44, actually expended. The master gives the reasons for such a reduced estimate. He says:

"In the matter of fixing rates the present act does not contemplate that the rates should be fixed annually. While the act provides a method by which such rates may be changed from time to time, and which could be so followed as to require rates to be fixed annually, it is clearly not the contemplation of the law that the rates should be so fixed. * * * There are many items in the expense account which would be an easy matter to control by any distributor of water; as an illustration, canal cleaning, as well as the matter of repairs might be deferred for one or two years, and then an unusual amount of cleaning and repairs done in one year solely for the purpose of having the rates adjudged insufficient. * * * It seems to me that it is both advantageous to the canal company and to the people of the counties that these rates should be so fixed that they will produce the annual rate on the average which the Legislature intended that such company shall receive, but not less than 6 per cent., and that the question as to whether such rates are sufficient should be determined upon the basis of an average maintenance expense."

In view of the large deduction of 30 per cent., amounting to $94,-654.54, made by the master on account of the depreciated condition of the property upon which the complainant is to receive a correspondingly reduced income, and the further reduction of $9,686.21 from the amount actually expended in 1908 for cleaning complainant's canals in estimating the average annual expenses for that work it would seem that the maintenance account might very well stand without further reduction.

In my opinion it is the duty of the complainant to keep its works in good repair, and depreciation promptly met by replacements. The number of acres irrigated under complainant's system for the year ending June 30, 1908, was 93,003.35. An allowance of $9,561.06 for annual depreciation, in addition to $67,114.84 found by the master as the annual maintenance account, and the sum of $488.10 for the federal excise tax, would make the total sum of $77,164. This sum will be approximately an allowance of 83 cents per acre for cost of maintenance, which appears to be less than the average cost of maintenance for 20 of the United States reclamation service projects, where the average is reported to be $1 per acre. Wiel on Water Rights in the Western States (3d Ed.) §§ 1288, 1399. I shall therefore concur in the master's estimate of $67,114.84 for the annual maintenance, including current repairs; and shall also find that the sum of $9,561.-06 should be allowed from the annual earnings to meet depreciation and keep the property unimpaired.

The master's finding that the value of complainant's tangible property is $896,829.55 is, therefore, sustained. The estimate for annual maintenance, amounting to $67,114.84, to which is added the sum of $488.10 for the federal excise tax, is also sustained. But to this estimate I will add the estimate of $9,561.06 for annual depreciation, making the total amount for maintenance, including repairs and the

allowance for depreciation and excise tax the sum of $77,164. The master's estimate that the total amount which the complainant should receive annually from water rates and other minor revenues is the sum of $136,697.35. Deducting from this amount the estimated annual expense of $77,164, there will be left the sum of $59,533.35 as complainant's net annual income on the value of its property. This sum is still in excess of 6 per cent. of the value of complainant's tangible property, the minimum fixed by the statute.

[4] But there remains to be considered complainant's claim that the valuation of its property should include a valuation of its alleged water rights, which it values at $1,000,000. The complainant introduced testimony tending to support this claim. It is contended by complainant that this testimony tended to show that complainant's predecessor had purchased and paid for certain interests the sum of $112,000, and had by contracts made concessions in water rates amounting to $341,595.67 to parties owning lands riparian to the San Joaquin river below complainant's point of diversion, upon a supposed waiver by such landowners of their riparian rights as against complainant's appropriation of water from the river. I shall not review this testimony. I have carefully read it all, and I agree with the master that it does not support complainant's claim. It is contended, however, on the part of the complainant, that, whether it paid anything for the right of appropriation or not, the fact is not conclusive of its value at the time of use, and I am of the opinion that it is not material to the controlling question whether the water right is property which the complainant as a carrier is entitled to have valued as its property under the statute. The latter question is the one to be considered in this case. The master found that the water right claimed by complainant was a valuable one, and under the testimony was of the approximate value of $1,000,000. But the master did not find that this water right was property owned by the complainant, and rejected the claim. Complainant also contended that, as it was the owner of the franchise to collect rates for the diversion and distribution of water to its customers, it was entitled to have this franchise valued as property. It was further contended by the complainant that it was a "going concern," and was entitled to have that fact considered in estimating the value of its property.

The master's report upon this feature of the case is as follows:

"It will be noted that in enumerating the properties to be valued no mention is made of the valuation of the water right, but the property to be valued is described as all property actually used and useful to the appropriation and furnishing of such water. I agree, however, with counsel that if such water right is property of the complainant that the same could not be taken for public use without compensation; also, that the value of the water right in this case is a very valuable one, and under the testimony its valuation is approximately $1,000,000. Also I agree with counsel that a water right is property, and cannot be taken from the owner thereof for a public use without compensation. The question presented, however, is whether complainant is the owner of the waters that it delivers to its customers. All the cases cited by counsel for complainant sustain the proposition that a water right is property, and cannot be taken for a public use without compensation, but all of such cases, so far as my investigation of the same has shown, refer to the taking of the property from the user of the water; that is, the riparian own-

er who has acquired a right to the water by reason of appropriation or otherwise, and do not refer to the taking of the water by the public from a corporation or person who acts as and whose business is that of a distributor. Counsel in their argument state that there were no cases directly in point on this question. It seems to me, however, that the case of San Diego, etc., v. National City [C. C.] 74 Fed. 79, is in point."

The master refers to the fact that the decision is by United States Circuit Judge Ross, and quotes from the opinion as to the water rights claimed in that case as follows:

"One of the objects of the present suit is to obtain a decree establishing the validity of that claim of the complainant to exact a sum of money in addition to an annual charge as a condition on which alone the complainant will furnish consumers of water for irrigation purposes other than those to whom it had furnished it for such purposes prior to December 18, 1892. And the contest that arose between the consumers and the company over this charge for a so-called water right and the refusal of the municipal authorities of National City to allow that charge in respect to acreage property within the city limits is one of the principal causes of the present suit. 'It does not change the essence of the thing for which the complainant demands a sum of money to call it a water right, or to say, as it does, that the charge is imposed for the purpose of reimbursing complainant in part for the outlay to which it has been subjected. It is demanding a sum of money for doing what the Constitution and the laws of California authorized it to appropriate waters within its limits, conferred upon it the great power of eminent domain and the franchise to distribute and sell the water so appropriated, not only to those needing it for purposes of irrigation, but also to the cities and towns and their inhabitants, within its flow, for which it was given the right to charge rates to be established by law, and nothing else. No authority can anywhere be found for any charge for the so-called 'water right.' The state permitted the water in question to be appropriated for distribution and sale for purposes of irrigation, and for domestic and other beneficial uses, conferring upon the appropriator the great power mentioned, and compensating it for its outlay by the fixed annual rates. The complainant was not obliged to avail itself of the offer of the state, but choosing, as it did, to accept the benefits conferred by the Constitution and laws of California, it accepted them charged with the corresponding burden. Appropriating, as it did, the water in question for distribution and sale, it thereupon became, according to the express declaration of the Constitution, charged with a public use."

"Whenever," said the Supreme Court of California in McCrary v. Beaudry, 67 Cal. 120, 121, 7 Pac. 264 [265], "water is appropriated for distribution and sale, the public has a right to use it; that is, each member of the community by paying the rate fixed for supplying it has a right to use a reasonable quantity of it in a reasonable manner. Water appropriated for distribution and sale is ipso facto devoted to public use, which is inconsistent with the right of the person so appropriating it to exercise the same control over it that he might have exercised if he had never appropriated it."

The master proceeds as follows:

"Counsel for complainant in their reply brief claim that the court in the National City case held that, the board having fixed the rates that the company might charge for the furnishing of water, that the company sought to charge in addition to those rates a charge for the water right—that is, for the right of the consumer to get the water—but the court properly held that this was included in the rates fixed by the board. Therefore they claim that the case is not in point. I do not find in the opinion of the court that, as claimed by counsel, the court held that the value of the water right was included in the rates fixed. On the contrary, it seems to me the case directly

decides that there can be no charge for the so-called water right. It seems to me to be very clear that, if a company which has appropriated certain waters could not charge for a water right as a condition precedent before such water would be delivered to a consumer, such company would not have the right to have a valuation of such water right added to the valuation of its properties used in distributing the water and the rates increased by such valuation of water rights. This would be doing indirectly that which they could not do directly. The principle involved seems to me to be that a distributor of water does not acquire any interest in the water itself, except for the purpose of distribution, and that, as stated by the court in the quotation aforesaid, its sole compensation is to be derived in the right to charge rates for such distribution. They are authorized under the law to appropriate water for this purpose, and to charge for such right is to charge for doing that which the Constitution and the laws of California authorize them to do. As an illustration, to show that the right of the company to the water as an appropriator does not give a right to the water itself, let us assume that the waters distributed by the complainant in this case should be required for a greater public use, for instance the supplying of some municipality with water, and condemnation proceedings should be brought to obtain such water. It cannot be questioned that the right to such water is of great value to the farming community using the same, and that such users could not be deprived of such water without just compensation, and that such compensation might be the difference between the value of their lands with the water and without the water. But such damage would certainly be payable to the users, and not to the canal company. It is true that the canal company might also be damaged by reason of the taking of such water and thus destroying their business, but such damage would not arise from the value of the water itself, but by reason of the loss of their franchise, which is their right to charge rates, as defined by the act.

"Counsel for complainant in their brief state that, 'even if this value (the alleged value of the water right) should not be considered as a distinct item eo nomine, it is evident that the value of complainant's franchise and business is increased to that extent by the existence of that right.' If complainant means by this that the value of its franchise is increased to the extent of the full value of its water rights, such a construction would be allowing them the very matter which it is decided that they are not entitled to. Under the recent decision of the United States Supreme Court in the case of Willcox v. Consolidated Gas Company, decided by the United States Supreme Court on January 4, 1909, it is decided that a franchise is such property as should be valued in the matter of the fixing of rates, in that case a municipal gas corporation. Counsel for defendants state that the court decides in that case that a franchise shall not be included in valuing the plant. I do not read such decision to that effect, but, on the contrary, that a franchise is property and must be valued, and that complainant would be entitled to a valuation on its franchise, which under the act of California providing for the regulation of rates is described as its right to collect rates. No testimony has been offered in this case for the purpose of fixing such valuations. Counsel for complainant in their brief as to the items which should enter into their properties have made no claim that under the evidence they have established any valuation for a franchise or for the good will or a valuation as a going concern."

I agree with the master in his interpretation of Judge Ross' decision. The latter said distinctly that "no authority can anywhere be found for any charge for the so-called water right." This was equivalent to saying that under the Constitution and laws of the state the water company, as a mere appropriator and carrier of water for distribution to consumers, had no such right.

The San Diego Case was appealed to the Supreme Court of the United States, but that court did not find it necessary to pass upon this particular question. But in San Diego Flume Co. v. Souther, 104 Fed. 706, 44 C. C. A. 143, the Circuit Court of Appeals for this

circuit, following the Supreme Court of California in the case of Irrigation Company v. Park, 129 Cal. 437, 62 Pac. 87, held valid a contract exacting a sum of money in addition to the legally established rate for the so-called water right; and in the case of Souther v. San Diego Flume Co. (C. C.) 112 Fed. 228, Judge Ross yielded to that decision; but in the subsequent case of Boise City Irr. & Land Co. v. Clark, 131 Fed. 415, 65 C. C. A. 399, in the Circuit Court of Appeals, Judge Ross being then a member of the court and writing its opinion, adhered to his original opinion in the San Diego Case in passing upon the validity of certain water right contracts. That case arose in the state of Idaho whose Constitution provides, substantially as does the Constitution of the state of California, that the use of the waters of the state appropriated for sale, rental, or distribution is a public use and the right to collect compensation therefor a franchise, which cannot be exercised except by authority of and in the manner prescribed by law. The Constitution further authorizes the Legislature to fix, as it had done, the maximum rates to be charged for waters sold. It was held by the Circuit Court of Appeals, Judge Ross speaking for the court and following his decision in the San Diego Case and the case of Stanislaus County v. San Joaquin & Kings River Canal & Irr. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406, that an irrigation company appropriating water for sale under the statute had no authority to make private contracts for so-called perpetual water rights, and that such contracts were void. It appears that there was an inequality in these contracts, but their invalidity was not based upon that ground, but because, as in the San Diego Case, they were contrary to the terms of the public use provided by the Constitution and laws of the state. In the meantime the doctrine of the Park Case was somewhat modified by the Supreme Court of the state in the case of Crow v. San Joaquin & Kings River Canal & Irrigation Co., 130 Cal. 309, 62 Pac. 562, 1058, where it was held that a regulation of the company providing that "no land will be supplied with water unless all dues and claims for previous supply on that land shall have been paid" was not binding upon the consumer. It was held that, if the regulation could be considered a contract, it was without consideration, and that it was the duty of the water company under the law in California to furnish the consumer with water upon a tender of the established rates, and that this rule precluded the idea that any other duties could be prescribed or imposed except the tender of the rate as a condition for supplying water as required by law.

It may be said that the later case of Stanislaus Water Co. v. Bachman, 152 Cal. 716, 93 Pac. 858, 15 L. R. A. (N. S.) 359, reaffirms the doctrine of the Park Case, but there was some question in the Bachman Case whether the water company was in private ownership and use at the time the Constitution of the state was adopted, and whether the water right had become such a public use in the sense of that term as used in the Constitution. But, if it was conceded that the water right had become such a public use, the court was of the opinion that the constitutional provision was not intended to prevent a landowner from acquiring and attaching to his land a right to the permanent use of water for its irrigation. That is a different question from the one

we are now considering. The question here is whether the Constitution in declaring that the use of all water appropriated for sale, rental, or distribution to be a public use attaches the water right to the land for which the water is appropriated. The Bachman Case does not hold to the contrary, but, however that may be, in the still later case of Leavitt v. Lassen, 157 Cal. 82, 106 Pac. 404, 29 L. R. A. (N. S.) 213, and Lassen Irrigation Co. v. Long, 157 Cal. 94, 106 Pac. 409, the Bachman Case is left to be "construed in the light of the facts there presented." In view of this limitation the Lassen Cases become specially important and interesting. They appear to clear up the question under consideration very materially, and, as they present the very latest expression of the Supreme Court upon the subject, they deserve to be carefully considered.

The plaintiff in the Leavitt Case was the owner of an irrigation system which appropriated waters from Susan river for the purpose of sale, rental, and distribution, and it was also claimed that, by means of the same canal and ditches, the plaintiff had made a private appropriation of waters for use upon his individual lands. He sold the system, but in selling reserved to himself the prior and perpetual right to take from the system a sufficient quantity of water to irrigate his individual lands free of charge. The purchaser of the irrigation system refused to allow the plaintiff to take water under such reservation.

In the second case the Lassen Irrigation Company, as plaintiff, sued the defendant to recover the reasonable value of its service in furnishing water for the irrigation of defendant's lands. The defendant set up by way of cross-complaint a contract made with the plaintiff's predecessor in interest, under which he contended that he had a permanent preferential right to water sufficient to irrigate his lands. The court in denying the validity of these contracts, speaking through Mr. Justice Henshaw, said:

"Treating Leavitt's appropriation as being wholly and entirely for public use, he, the owner of the system, was but an instrumentality for the distribution of the waters which he gathered to such members of the public as might apply for them and pay to him the legal charge for the service that he rendered. As the agent of such a public use, he had no power whatsoever to reserve to himself for his private purposes any part of this water."

Treating Leavitt as a private appropriator, the court held his so-called reservation invalid because it would reserve for himself an "undetermined quantity of water without regard to the amount he had been beneficially using."

The court said, further:

"Waiving all minor objections, had Purser (the purchaser of the irrigation system) the power so to burden his public trust with this perpetual private right, Purser, it is to be remembered, held all of these waters as an appropriator for sale, rental, and distribution under the Constitution of 1879. He was but the purveyor of this public use, the agent in the execution of this public trust. If, by any method, however devious, there can be carved out of this public trust such a private right, it must obviously result in the destruction of the public use itself."

Again the court said:

"The right of an individual to a public use of water is in the nature of a public right possessed by reason of his status as a person of the class for

whose benefit the water is appropriated or dedicated. All who enter the class may demand the use of the water, regardless of whether they have previously enjoyed it or not."

The theory that the carrier or distributor of water, the use of which is declared by law to be a public use, is but the purveyor of this public use, the agent in the execution of this public trust, has been adopted in the state of Colorado, where the Supreme Court of that state in Wheeler v. Northern Irr. Co., 10 Colo. 582, 17 Pac. 487, 3 Am. St. Rep. 603, under a constitutional provision substantially the same as that of California, held that the carrier of water dedicated to the public use was "at least a quasi public servant or agent," that it was "not in the attitude of a private individual contracting for the sale or use of his private property," and that it "exists largely for the benefit of others, being engaged in the business of transporting for hire water owned by the public to the people owning a right to its use," that "the carrier must be regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional right, as well as a private enterprise prosecuted for the benefit of its owners."

In the later case of Wyatt v. Larimer, 18 Colo. 298, 33 Pac. 144, 36 Am. St. Rep. 280, the same court said:

"We adhere to the doctrine that such a canal company (irrigation company) is not the appropriator of the water diverted by it, but that 'it must be regarded as 'an intermediate' agency existing for the purpose of aiding consumers in the exercise of their constitutional right as well as a private enterprise prosecuted for the benefit of its owners' "—citing a number of Colorado cases.

In Nebraska the irrigation act of 1895 (Laws 1895, c. 69) attached the right to the use of the water for irrigation purposes to the land to be irrigated. In Farmers' Canal Co. v. Frank, 72 Neb. 136, 100 N. W. 286, the Supreme Court of the state, referring to this statute, said:

"The doctrine of private ownership of water for irrigation purposes, disassociated from the land to which it is designed to be applied, has been proved by long experience to be detrimental to the public welfare. It has proved productive of endless controversies and abuses, and has given rise to interminable litigation. The other doctrine is that the right to the use of water should never be separated from the land to which it is to be applied."

The court then quotes the following from the report of Elwood Mead on Irrigation in California, United States Agricultural Department, 1901, p. 38:

"Where this doctrine prevails, canals and ditches become, like railroads, great semipublic utilities, means of conveyance of a public commodity, their owners entitled to adequate compensation for services rendered, but having no ownership in the property distributed."

The court, in further discussing the relation of the irrigation company to the water consumers for whose lands it has been allowed to appropriate the same, said:

"The law grants to corporations of this character valuable rights, but with these rights are accompanying duties to the landholders for the irrigation of whose land the rights are granted, and, if these obligations are not fulfilled, the law will interfere at the request of the party injured. The irrigation

company does not own the water. It is only the servant of the public to carry it to the land for which it has been appropriated, and this service it is bound to perform."

In these cases the theory that the irrigation company is an intermediate agency in the execution of a public trust is necessarily based upon the doctrine that the right to appropriated water is attached to the land. The company cannot at the same time be principal and agent. It cannot own the water or the right to appropriate and sell it, and at the same time be the agent of the public in appropriating it for a public use. The logical relationship of such a company to its appropriated water is that of agent of the owner of the land in diverting and bringing the water to the land for which it has been appropriated. But it is immaterial whether the company is deemed to be the agent of the public in diverting and carrying the water owned by the public to the consumer who owns the right to its beneficial use, or the agent of the consumer in diverting and carrying the water to his principal for a beneficial use. In either case, while the carrier is entitled to be paid for his services as a carrier a reasonable compensation under such regulations as the law may prescribe, he is not the owner of the water carried or the water right created by its diversion, and he cannot compel the consumer to purchase it, and to pay for its use, either in the way of an annual or other rate upon its supposed value as a property right.

One of the methods suggested by the complainant for estimating the value of its alleged water right was upon the basis that the value of the right to have water to irrigate land may be measured by the excess of the value of the land with such a right over that which it possessed without such a right, less the expense incurred by the landowner and the canal company in introducing the irrigating system. By this method the following estimate was obtained: The value of the land without water was $855,312. To bring the land under irrigation, the landowners had constructed lateral ditches costing $162,000, making a total of $1,017,312 as the investment of the landowners. The complainant's irrigation works cost $1,042,940.05, making a combined expenditure on the part of the landowners and complainant of $2,060,252.05. The value of the land with water was estimated at $4,122,210. Deducting from this amount the combined expenditure of $2,060,252.05, and we have as the value of the water upon the land the sum of $2,061,957.95. This sum divided in half would be $1,030,978.97, which would represent the increased value of the land upon the landowner's investment, and also the increased value upon the canal owner's investment—that is to say, the sum of $1,030,978.97 for each—and accordingly this sum is claimed by the complainant as the value of its water right. This method of working out a water right for the complainant and fixing its value is plausible, but not sound. It assumes that the irrigation company has obtained a partnership interest in the land irrigated, when none has been secured by contract or provided for by law. As well might a railroad company in estimating the value of its property for rate purposes add to the value of its railroad property the valuation for a share or interest in the increased value of the land through which the railroad has been built,

and to the owners of which it distributes merchandise as a carrier. This method of valuation of a water right discloses, however, its real basis and character; to be of substance and value it must be attached to the land and be a part and parcel of that interest. What Mr. Justice Henshaw said in the Leavitt Case with respect to a private right of service from the carrier is equally applicable to such a water right:

"If by any method, however devious, there can be carved out of this public trust such a private right, it must obviously result in the destruction of the public use itself."

This theory of the relation of the carrier to the water right as an intermediate agent is in accord with the law of beneficial use prevailing in all the Western states where the right of appropriation is derived from Act Cong. July 26, 1866, c. 264, 14 Stat. 251, and is there limited to some useful or beneficial purpose. As said by Mr. Justice Field in Atchison v. Peterson, 20 Wall. 514 (22 L. Ed. 414):

"The right to water by appropriation is limited in every case in quantity and quality by the uses for which the appropriation is made."

This was said with respect to the use of water for mining purposes, but in the subsequent case of Basey v. Gallagher, 20 Wall. 682, 22 L. Ed. 452, the court held that the views and rulings made in the case of Atchison v. Peterson "are equally applicable to the use of water on the public lands for the purposes of irrigation." To the same effect is the desert land act (Act March 3, 1877, c. 107, 19 Stat. 377 [U. S. Comp. St. 1901, p. 1548]), where it is provided that the right to the use of water on desert land "shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation." The Civil Code of California provides in section 1411, with respect to water rights acquired by appropriation:

"The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest ceases to use it for such a purpose, the right ceases."

Section 8, Act Cong. June 17, 1902, c. 1093, 32 Stat. 390 (U. S. Comp. St. Supp. 1909, p. 600), commonly called the "Irrigation Act," provides that:

"The right to the use of water acquired under the provisions of this act shall be appurtenant to the land irrigated, and beneficial use shall be the basis and measure and limit of the right."

The same provision has been incorporated into the laws of most of the Western states, not, however, as new legislation, but as the established definition of a water right under the acts of Congress and the constitutional provisions of the states declaring that the use of appropriated water is a public use. The right of diversion is accordingly limited to the beneficial use made by the consumer. Anderson v. Bassman (C. C.) 140 Fed. 14; Wiel on Water Rights in the Western States (3d Ed.) § 478. The complainant in this case claims to have acquired by prescription against all riparian owners and by appropriation against the world the right to divert from the San Joaquin river the quantity of water which the evidence shows it has diverted into

and through its canals for more than five years, to wit, 1,350 cubic feet of water per second. The claim, as stated, is manifestly not sufficient to state a right of diversion. It must appear, further, that the complainant is either the owner of land for which the water is being appropriated for a beneficial use, or that the water is being diverted for the purpose of being carried by the complainant to consumers who own land for which the water is being appropriated for a beneficial use, and that the water is being so used. The complainant in this case is not the owner of any land for which the water is being appropriated. The complainant's right to divert the water of the river is therefore based upon and is measured and limited by the beneficial use of certain consumers for which the water is being appropriated. But, if the amount required by these consumers for a beneficial use is not 1,350 cubic feet of water per second, then complainant has no right to divert that quantity of water; or if, for example, these consumers require only 100 cubic feet per second for beneficial use, then that would be the basis and measure and limit of complainant's right to divert water from the river, and not the capacity of complainant's headworks, canals, and ditches used in making such diversion. The water right must, therefore, be the right of the consumer and attached to his land, and not the right of the complainant attached to its canal system. It follows that, under the law of this state, it cannot be valued as a property right upon which the complainant is entitled to an income from the water rate to be paid by the consumer. I do not overlook the fact that the right of the carrier to divert water from a running stream has been recognized in this state in some instances as a water right vested in the carrier, and that valuations of such supposed rights have been admitted by the consumers; but the consumers have not admitted that right in this case, and as I do not find it established by law, and the evidence is not sufficient to make it a law growing out of custom, I conclude that it is not a right that complainant is entitled to have valued as its property right in this case.

The complainant contends, further, that it is entitled to a valuation upon its "franchise" and upon the value of its plant as a "going concern," but the valuation claimed is based upon the value of its supposed water right, which, as has already been determined, is not a property right belonging to the complainant, and cannot, therefore, be so considered in any estimate of complainant's property either as a "franchise" or as the business of a "going concern."

I think that under the law of this state and the authority of Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, the complainant is entitled to have its franchise valued by the boards of supervisors of the counties of Stanislaus, Merced, and Fresno as part of complainant's property, used and useful in the appropriation and distribution of water to the inhabitants of those counties. But there is no evidence before the court upon which such a valuation can be made in this case, nor is there evidence upon which the court can value complainant's property as a "going concern." It follows that as complainant's net income is in excess of 6 per cent.

(the minimum fixed by the statute) on the estimated value of complainant's property, used and useful in the business in which it is employed, the complainant has no cause of action, and the bill must be dismissed.

The temporary injunction heretofore issued in this case is dissolved, and the bill dismissed.