# STANISLAUS COUNTY *v.* SAN JOAQUIN AND KING'S RIVER CANAL AND IRRIGATION COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 80. Argued November 13, 30, December 1, 1903.—Decided January 18, 1904.

A corporation although organized under a general statute may nevertheless thereby enter into and obtain a contract from the State which may be of such a nature that it can only be altered in case the power to alter was, prior thereto, provided for in the constitution or legislation of the State.

The provision in the California Water Act of 1862 that county boards of supervisors should regulate water rates but could not reduce them below a certain point does not amount to a contract with water companies, which would be impaired within the meaning of the Federal Constitution by a subsequent act either reducing the rates below such point or authorizing boards of supervisors to do so.

Statutes of California providing that the use of all water appropriated for sale, rental or distribution should be a public use and subject to public regulation and control are valid.

To regulate or establish rates for which water will be supplied is, in its nature, the execution of one of the powers of the State, and the right of the State to do so should not be regarded as parted with any sooner than the right of taxation should be so regarded, and the language of the alleged contract should in both cases be equally plain.

Although there is a limitation to the power of amendment when reserved in the constitution or statute of a State it is not confiscation nor a taking of property without due process of law, nor a denial of the equal protection of the laws, to fix water rates so as to give an income of six per cent upon the then value of the property actually used, even though the company had prior thereto been allowed to fix rates securing one and a half per cent per month, and if not hampered by an unalterable contract a law reducing the compensation as above is not unconstitutional.

THE county above named has appealed directly to this court from a decree of the Circuit Court of the United States for the Northern District of California, setting aside an ordinance adopted by the board of supervisors of Stanislaus County on June 24, 1896, designating the water rates which were to be charged by the company (appellee) to its water consumers for

the ensuing year. The appeal here is on the ground that the case involved the construction or application of the Constitution of the United States, under section 5 of the act of 1891. 26 Stat. 826.

The company was incorporated in 1871, under an act of the California legislature approved in 1853, Stat. of 1853, p. 87, as amended in 1862, Stat. of 1862, p. 540. After its incorporation and the obtaining of the necessary land the company built a canal or reservoir at a cost, as alleged, of about a million dollars, and it is averred that the property was and is of that value. Subsequently to the completion of its works the company furnished water for irrigating purposes to its customers at rates fixed by it, which were not interfered with by the board of supervisors up to the time of the adoption of the above-mentioned ordinance of June 24, 1896. Soon afterwards the company commenced this suit for the purpose of obtaining a decree setting the ordinance aside and declaring it to be null and void, and decreeing that the company was entitled to have the rates for supplying its water to its customers and the users thereof generally so fixed that they would in the aggregate furnish a reasonable and just compensation for the services rendered and a fair, just and equitable return therefor.

The act of 1862 provided in section 3, as follows:

"Every company organized as aforesaid shall have power, and the same is hereby granted, . . . to establish, collect and receive rates, water rents or tolls which shall be subject to regulation by the board of supervisors of the county or counties in which the work is situated, but which shall not be reduced by the supervisors so low as to yield to the stockholders less than one and one-half per cent per month upon the capital actually invested."

On March 12, 1885, the legislature passed an act, Cal. Stat. 1885, page 95, providing for the fixing by the board of supervisors of a county of the rates to be collected by water companies. Section 5 of that act authorized the various boards of supervisors in the State to regulate and control the water

rates that might be charged in their respective counties by any person, company, association or corporation, and provided:

"Said boards of supervisors, in fixing such rates, shall, as near as may be, so adjust them that the net annual receipts and profits thereof to the said persons, companies, associations and corporations so furnishing such water to such inhabitants shall be not less than six nor more than eighteen per cent upon the said value of the canals, ditches, flumes, chutes and all other property actually used and useful to the appropriation and furnishing of such water of each of such persons, companies, associations and corporations; but in estimating such net receipts and profits the cost of any extensions, enlargements or other permanent improvements of such water rights or waterworks shall not be included as part of the said expenses of management, repairs and operating of such works, but when accomplished may and shall be included in the present cost and cash value of such work. In fixing said rates, within the limits aforesaid, at which water shall be so furnished as to each of such persons, companies, associations and corporations, each of said boards of supervisors may likewise take into estimation any and all other facts, circumstances and conditions pertinent thereto, to the end and purpose that said rates shall be equal, reasonable and just, both to such persons, companies, associations and corporations and to said inhabitants."

The complainant alleges in its bill that prior to March 12, 1885, at the time of the passage of the act of that date, the company and its incorporators had actually invested under the authority of the act of 1862 a capital amounting to $971,113.13 in money, all of which was actually, reasonably and necessarily expended by the complainant in the purchase and construction of its canals and other property actually used in and useful to the appropriation and furnishing of the water, and that the property was on the last named date and still is of the reasonable worth of $971,113.13. The complainant averred that if the act of 1885 was construed as repealing,

altering or amending the provisions of the act of 1862, as to rates to be charged by the company, then that the act of 1885 was in violation of and repugnant to the provisions of article I, section 10, of the Constitution of the United States, and as thus construed the act of 1885 impaired the obligation of the contract between the State of California and the complainant, entered into under the authority of section 3 of the act of 1862.

It was also averred that the rates, as fixed by the board under the act of 1885, would result in taking the property of the complainant without due process of law, and in depriving it of the equal protection of the laws.

An answer was put in taking issue with the complainant on the averments in its bill, and a trial was had in the Circuit Court. That court held, 113 Fed. Rep. 930, that there was a contract under the act of 1862, as contended for by the complainant; that the act of 1885 could not be so construed as to permit the board of supervisors, in fixing water rates by its authority, to entirely disregard the capital actually invested in the property of the corporation under the act of 1862, and that if otherwise construed the act of 1885 would run counter to the constitutional provision that no law impairing the obligation of a contract should be passed, and the statute would be subjected to the further objection that, as so construed, the State would deprive complainant of its property without due process of law, and would also deny to it the equal protection of the laws as provided for in the Federal Constitution, and that such provision could not be held subordinate to the constitutional power conferred upon the state legislature to alter, amend or repeal the general laws concerning corporations. It was also said by the court that it was the duty of the board of supervisors to ascertain the amount of the capital actually invested in the corporation; that is to say, the amount of the capital actually paid in and invested in constructing the canals and acquiring the other property used and made useful in supplying water to the customers of the corporation in Stanislaus County, and this fact should have been considered by the

board in fixing the water rates which the complainant was entitled to charge under the statute; that when the board of supervisors fixed the rates no consideration was given by it to the evidence showing the amount of the capital actually put into the corporation, or the actual, reasonable and proper cost of the works; that the evidence establishes the fact that the board failed to perform its duty in this respect, and that by reason thereof it deprived the complainant of its property without due process of law, and denied to it the equal protection of the laws.

The court found that the evidence showed that the rate fixed by the board of supervisors reduced the income of the company considerably below six per cent upon the capital actually invested in the property of the corporation, and if a corresponding reduction were made in Fresno and Merced Counties its income would, under the most favorable conditions, be reduced to less than five per cent per annum on the value of the property as estimated by the board of supervisors.

The court also held that the company had waived the right to fix rates as high as permitted under the act of 1862, by failing to make them as high as therein permitted, prior to the passage of the act of 1885, and the act of 1885, "providing that the net annual receipts as adjusted by the board of supervisors should not be less than six nor more than eighteen per cent per annum, is therefore properly applicable to the regulation of complainant's rates."

*Mr. James P. Langhorne,* with whom *Mr. Duncan Hayne* and *Mr. Frederic D. McKenney* were on the brief, for appellants.

*Mr. W. B. Treadwell* for appellee.

Mr. Justice Peckham, after making the foregoing statement, delivered the opinion of the court.

*First.* The question which first arises in this case is whether

there was a contract with the company under the act of 1862, by reason of which the State could not thereafter authorize the board of supervisors to reduce the rates so low as to yield less than one and one-half per cent per month upon the capital actually invested.

The acts of 1853 and 1862 are general laws, the former providing for the formation of corporations of the character named therein, and the latter amending that act, and especially providing for the incorporation of canal companies and the construction of canals. No special charter was given the company directly from the legislature otherwise than is contained in the powers granted by the two acts above named. A company, although organized under a general statute, may nevertheless thereby enter into and obtain a contract from the State which may be of such a nature that it can only be altered in case power to alter was, prior thereto, provided for in the constitution or legislation of the State.

In Salt Company v. East Saginaw, 13 Wall. 373, it was said by Mr. Justice Bradley, in delivering the opinion of the court, page 378, that:

"Corporations formed under general laws in place of special charters, like the Ohio banks under the general banking law of that State, are entitled to the benefit of specific provisions and exemptions contained in those laws, which are regarded in the same light as if inserted in special charters. 'The act is as special to each bank,' says Justice McLean, delivering the opinion of this court, 'as if no other institutions were incorporated under it.' In such cases the scope of the act takes in the whole period for which the corporation is formed. The language means that, during the existence of any corporation formed under the act, the stipulation of exemption specified in it is to operate."

The language used in conferring power to fix rates in the act of 1862 is to be taken as if it were contained in a special charter granted by the legislature to this company. The question then arises whether language such as is contained in the third

section of that act, and which is set forth in the foregoing statement of facts, amounts to a contract to be protected by the Constitution of the United States? We think it does not.

It seems to us that language of this nature cannot properly be construed as a promise or pledge that the limitation as to rates may not be altered at any time when in the judgment of the legislature it may be proper so to do. Water rates which might have been perfectly reasonable at the time of the passage of the act of 1862, although amounting to one and one-half per cent per month upon the capital actually invested, might in the course of years become exceedingly burdensome to those who used the water and amount to a very unreasonable compensation to the company for the water it sold. Irrigation by means of corporations formed to supply water was in its infancy in 1862 in California, and the risks necessarily taken in the organization of such companies and the prosecution of their work were then not only very large but also extremely uncertain in character. Consequently, a rate of compensation was proper at that time which in the course of years and the accumulated experience as to the necessary cost of such works, and of their successful operation including the consideration of the risk attendant upon their operation, would make a water rate, as provided by the act of 1862, a very unreasonable overcharge. These facts must have been present in the minds of those who enacted the legislation of 1862, and it would be most unreasonable to suppose that it was intended by any such legislation to forever thereafter tie the hands of the State in regard to all companies organized under the act of 1862 and before the passage of the act of 1885.

The authority given by the act of 1862 enabled the board of supervisors to conditionally regulate the rates. There is no promise made in the act that the legislature would not itself subsequently alter that authority. The State simply authorized its agents, the boards of supervisors, to regulate rates, but not to reduce them below a certain point. We do not think that from this language a contract can or ought to be

implied that the State might not thereafter authorize the boards to reduce them, or that it might not itself do so directly. Even as between individuals, such an implication would not be a reasonable one from the language used, and as the contract, if it existed, would take away from the legislature its otherwise undoubted right of regulation upon a subject of great public importance, there is still less reason for implying a contract which would prevent the State from using its power to that end for the future. The language of this portion of the act applies to the boards and limits their right of reduction, leaving unhampered the right of the State to interfere directly or by authorizing the boards to reduce the rates below the point stated in the act. In order to make such a contract the language must be plain and susceptible of no other reasonable construction. *Freeport Company* v. *Freeport City*, 180 U. S. 587, 599, citing *Railroad Commission Cases*, 116 U. S. 307, 325.

In our belief, the language of the act of 1862 does not and was not intended to form a contract, but simply amounted to the statement of the then pleasure of the legislature, to so remain until subsequently altered by it. The cases heretofore decided in this court are authority for this view. Some of them are now referred to.

In *Rector &c. of Christ Church* v. *Philadelphia*, 24 How. 300, the following language was used in the statute: "The real property, including ground rents, now belonging and payable to Christ Church Hospital, in the city of Philadelphia, so long as the same shall continue to belong to the said hospital, shall be and remain free from taxes." A subsequent law provided that all property belonging to an association or incorporated company which was then by law exempt from taxation should thereafter be subject to taxation in the same manner as other property. The later law was held not to be in violation of the Constitution of the United States. It was held that language such as this was nothing but in the nature of a privilege, which existed only during the pleasure of and might be revoked by the sovereign power whenever it chose so to do.

*Salt Company* v. *East Saginaw*, 13 Wall. 373, *supra*, was a case where the court held that the language used was that conferring a bounty, and that it did not amount to a contract in such a sense that it could not be repealed, although it did grant an exemption from taxation of the property used for the purpose of obtaining salt. In regard to the language exempting the property from taxation the court said:

"The law in question says to all: You shall have a bounty of ten cents per bushel for all salt manufactured, and the property used shall be free from taxes. But it does not say how long this shall continue; nor do the parties who enter upon the business promise how long they will continue the manufacture. It is an arrangement determinable at the will of either of the parties, as much so as the hiring of a laboring man by the day."

In *Tucker* v. *Ferguson*, 22 Wall. 527, it was also held that an act of the legislature exempting property of a railroad company from taxation was not a contract to exempt it unless there were a consideration for the act; that, without it, the promise was of a gratuity spontaneously made, which might be kept, changed or recalled, at pleasure, and that the rule applies to the agreements of States made without consideration as well as to those of persons.

In *Welch* v. *Cook*, 97 U. S. 541, the act of the legislative assembly of the District of Columbia of June 26, 1873, exempted from general taxes for ten years thereafter such real and personal property as might be actually employed within the District for manufacturing purposes. It was held that the language did not create an irrepealable contract with the owners of such property, but simply conferred a bounty, liable at any time to be withdrawn.

In *Grand Lodge &c.* v. *New Orleans*, 166 U. S. 143, the language exempted the property from taxation "so long as it is occupied as a Grand Lodge of the F. and A. Masons;" and it was held that it did not constitute a contract between the State and the plaintiff, but was a mere continuing gratuity,

which the legislature was at liberty to terminate and withdraw at any time.

In *Wisconsin & Michigan Railway Company* v. *Power*, decided at this term, 191 U. S. 379, the language of the act was: "That the rate of taxation fixed by this act or any other law of this State shall not apply to any railway company hereafter building and operating a line of railroad within this State north of parallel forty-four of latitude, until the same has been operated for the full period of ten years, unless the gross earnings shall equal four thousand dollars per mile." After the railroad company had been organized, and while that act was in force and on June 4, 1897, the State passed a law levying a specific tax upon the property and business of every railroad corporation operated within the State. The road in question would have been entitled to the exemption stated in the prior law if it were in force. The railroad contended that it had a contract by virtue of the language above set forth. This court held that no contract arose from the language used, and that consequently the subsequent act providing for taxation did not violate the Federal Constitution in regard to contracts.

Sufficient cases have been cited to show that language quite as strong as that used in the act of 1862 does not amount to a contract. It is true that the cases cited involved questions of alleged contracts for exemption from taxation, in regard to which it has been said that no presumption exists in favor of a contract by a State to exempt lands from taxation, and that every reasonable doubt should be resolved against it. Statutes of California providing that the use of all water appropriated. for sale, rental or distribution should be a public use and subject to public regulation and control are valid, *San Diego &c. Company* v. *National City*, 174 U. S. 739, and companies formed for the purpose of furnishing water for irrigation purposes have been held in that State to be public municipal corporations, and the use of the water for the purpose mentioned a public use. See cases cited in *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112, 159. To regulate or establish rates for which

water will be supplied is in its nature the execution of one of the powers of the State, and the right of the State so to do should not be regarded as parted with any sooner than the right of taxation should be so regarded, and the language of the alleged contract should in both cases be equally plain. *Owensboro* v. *Owensboro Waterworks Company,* 191 U. S. 358.

In our judgment the language of the act of 1862 did not amount to a contract that the rates for the use of water should never be lowered below the amount provided for in that act.

*Second.* But assuming there was a contract, we think the rates could be changed under that provision of the constitution of the State adopted in 1849, article 4, section 31, which provided:

"Corporations may be formed under general laws, but shall not be created by special act except for municipal purposes. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed."

This court has had frequent occasion to discuss the meaning and extent of the power thus reserved, as it exists in about all the States, either by constitutional or statutory provisions.

*Tomlinson* v. *Jessup,* 15 Wall. 454, held that the object of reserving a power to amend or repeal (p. 458) was:

"To prevent a grant of corporate rights and privileges in a form which will preclude legislative interference with their exercise if the public interest should at any time require such interference. It is a provision intended to preserve to the State control over its contract with the corporators, which without that provision would be irrepealable and protected from any measures affecting its obligation."

It was also said (p. 459):

"The reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges and immunities derived by its charter directly from the State."

In *Shields* v. *Ohio,* 95 U. S. 319, it was stated that by virtue of the power to alter, revoke or repeal an act, as provided in

the constituiton of Ohio, section 2, article 1, the legislature did not impair the obligation of a contract in prescribing rates for passenger transportation by a new consolidated company, although one of the original companies prior to the adoption of the constitution was organized under a charter which imposed no limitation as to rates.

In *Close* v. *Glenwood Cemetery*, 107 U. S. 466, it was again held that a power reserved in the legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of the charter granted, subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the legislature may deem necessary to secure either that object or any public right.

The same principle was decided in *Sinking Fund Cases*, 99 U. S. 700, 720; *New York &c. Railroad* v. *Bristol*, 151 U. S. 556, and *United States* v. *Union Pacific Railway*, 160 U. S. 1, 33.

*Covington* v. *Kentucky*, 173 U. S. 231, decided that language describing certain property, and providing that it should be and remain forever exempt from state, county and city tax, did not prevent the legislature from withdrawing such exemption and subjecting the property to taxation, in view of the statute that all charters and grants of the corporation should be subject to amendment or repeal at will of the legislature. Mr. Justice Harlan, in delivering the opinion of the court, said (p. 238):

"We are of opinion that the exemption from taxation embodied in that act did not tie the hands of the Commonwealth of Kentucky so that it could not, by legislation, withdraw such exemption and subject the property in question to taxation. The act of 1886 was passed subject to the provision in a general statute of Kentucky, above referred to, that all statutes 'shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed.' If that act in any sense constituted a contract between the city and the Commonwealth, the reservation in an

existing general statute of the right to amend or repeal it was itself a part of that contract."

To the same effect is *Knoxville Water Company* v. *Knoxville,* 189 U. S. 434.

These cases also hold that there is a limitation, even to the power of amendment when reserved in the constitution or a statute of a State. Some of the cases, although holding that the power to amend or repeal was properly exercised in them, also state that the power is not without limit; that the altera tions must be reasonably made, in good faith and consistent with the scope and object of the act of incorporation; and that sheer oppression and wrong could not be inflicted under the guise of amendment or alteration; that beyond the sphere of the reserved powers the vested rights of property in corporations in such cases is surrounded by the same sanction and are as inviolable as in other cases. In reiterating this view of the power, we think that a mere reduction of rates, while still leaving reasonable, fair or just compensation for the use of the property, is not prohibited, and we are quite clear that, even assuming there was a contract, the legislature nevertheless had the power to so alter and amend the act of 1862 as to provide for the fixing of rates as set forth in the act of 1885.

It is not confiscation nor a taking of property without due process of law, nor a denial of the equal protection of the laws, to fix water rates so as to give an income of six per cent upon the then value of the property actually used, for the purpose of supplying water as provided by law, even though the company had prior thereto been allowed to fix rates that would secure to it one and a half per cent a month income upon the capital actually invested in the undertaking. If not hampered by an unalterable contract, providing that a certain compensation should always be received, we think that a law which reduces the compensation theretofore allowed to six per cent upon the present value of the property used for the public is not unconstitutional. There is nothing in the nature of confiscation about it.

The original cost may have been too great; mistakes of construction, even though honest, may have been made, which necessarily enhanced the cost; more property may have been acquired than necessary or needful for the purpose intended. Other circumstances might exist which would show the original rates much too large for fair or reasonable compensation at the present time. Notwithstanding such facts, are the shareholders in the company to be forever entitled to eighteen per cent upon this cost, and does a reduction in amount, as provided for in the act of 1885, take away property in violation of the provisions of the Federal Constitution? We think not.

In this case much of the total amount expended in the course of the construction of the works was not proved by those who made such expenditures, and the items and total amount of the cost of construction were only proved by the books. What such books did not prove was the reasonableness of that cost, its propriety or necessity. There were statements that appeared in the minutes of the meetings of the shareholders which were put in evidence, that showed at least a dispute as to the proper cost of the works, and at one of these meetings a shareholder said there had been a waste in the management of the affairs of the company amounting to $350,000, which was caused by the chief engineer who had been in charge of the canal, and that his mistakes had cost the company a good deal of money. There would seem to have been more of a dispute as to who was responsible for this loss than over the fact of loss. At another meeting held in December, 1881, the president had said in his remarks to the meeting that, in his opinion, with careful management the canal would pay a fair revenue on what it ought to have cost. Although these minutes did not conclusively prove the fact of the excessive cost of the work, yet where the books of the company were substantially the only evidence of the amount expended and there was no other satisfactory evidence of the reasonableness of the expenditures, it would not be surprising if the board should have

regarded the statements in the minutes relating to excessive cost as a justification, if not a requirement, for the reduction of the cost of construction, upon which rates might be fixed, by at least the amount mentioned, $350,000.

Other considerations, in the shape of facts, circumstances and conditions pertinent to the alleged cost of the work and appearing in the course of the inquiry, may have been considered by the supervisors and the conclusion arrived at, after a consideration of all the material facts, that the rates fixed would result in justice to both the company and the consumers, as called for by the act.

Judging by this record, we are unable to say the board of supervisors failed to provide just and fair compensation for the use of the property by the public.

In *San Diego Land Company* v. *National City,* 174 U. S. 739, it was held, (following *Smyth* v. *Ames,* 169 U. S. 466, 543, 544,) that what the company was entitled to demand in order that it might have just compensation was a fair return upon the reasonable value of the property at the time it was being used for the public. The appellants in that case contended that in fixing what were just rates the court should take into consideration the cost of the plant and of its annual operation, the depreciation of the plant, and a fair profit to the company above its charges for its services. It was observed by the court that undoubtedly all these matters ought to be taken into consideration and such weight be given them, when rates are being fixed, as under all the circumstances would be just to the company and to the public. The same principle is reaffirmed in *San Diego Land &c. Company* v. *Jasper,* 189 U. S. 439, 442.

After taking such facts into consideration, the company might still be directed to receive rates that would be nothing more than a fair and just compensation or return upon the reasonable value of the property at the time it was being used for the supplying of the water to the public.

To take the amount actually invested into "estimation" does not mean necessarily that such amount is to control the

decision of the question of rates.   Other language would have been employed to express that thought.   The cost may be estimated, says the act, but that leaves open a reference to the other facts adverted to in the latter part of section 5, and it is upon a consideration of the whole case that the board is to determine what shall be reasonable, just and equal to all parties.   The record would seem to show that the board did take these various matters into consideration in coming to the conclusion it did in regard to the value of the property, although giving much less weight to such alleged cost than the company thought was proper.   The board added over $25,000 to the amount proved as the present cost of the construction of the canals, based on the prices of material, supplies and labor, of the date when the estimate was made, that estimate being $312,000, while the board fixed the valuation at $337,000.

Much of the capital was invested between twenty and thirty years ago, and to be able still to realize six per cent upon the money originally invested is more than most people are able to accomplish in any ordinary investment, and more than is necessary in order to give just compensation for property at the time it is used for the public purpose originally intended.

It is, of course, impossible to say what rates may be adopted in the other counties through which this canal runs, and that is one of the embarrassments under which the parties suffer from the language of the statute of 1885.   Heretofore the company has fixed its own rates therein.   Exactly how the question may be hereafter determined as to the percentage of income, where there are three different boards of supervisors who may fix rates for their respective counties, each differing from the other, is not made clear by the statute.   The complainant admits that the rates provided for by the supervisors under the act of 1885, if applied to all three counties, would allow complainant an income of substantially six per cent on $337,000, being $25,000 more than the present cost of the work would be, as shown by uncontradicted and satisfactory evidence.   Those rates exist in the other counties at present.

Hereafter, in case the other counties should fix rates in such manner that, taken as a whole, the rates in the three counties would not insure an income of at least six per cent, as provided for in the act of 1885, the company would of course not be bound to accept such rates, and a decree in this case would not bind it in regard to the propriety of rates for the future, as fixed by the ordinance of 1896 for the county of Stanislaus.

The judgment of the Circuit Court must be reversed and the bill dismissed without prejudice.

*So ordered.*