[Civ. No. 3503. Fourth Dist. Mar. 29, 1946.]

A. C. DeMELLO et al., Appellants, v. DAIRYMAN'S CO-OPERATIVE CREAMERY (a Corporation), Respondent.

Bradley & Bradley and Edward M. Selby for Appellants.

Maddox & Abercrombie for Respondent.

MARKS, J.—This is an appeal from a judgment which denied plaintiffs any relief in an action for declaratory relief. Plaintiffs have also attempted to appeal from an order denying their motion for new trial which is not appealable. (Code Civ. Proc., § 963.)

In 1909 the Dairyman's Co-operative Creamery, hereafter referred to as the creamery, was organized under sections 653b to 653l of the Civil Code and proceeded to operate as a marketing agency for dairy products. Each member paid $100 for his membership and was paid a so-called dividend, not to exceed 8 per cent, or $8 per annum until a reorganization in 1944.

The creamery handled the dairy products of its members and also of nonmembers. Monthly it paid them the going market price of dairy products with the exception that during the early years it paid nonmembers one cent less for whole milk and two cents less for cream than it paid to members. At the close of each year, after deducting what it had expended in plant expansion and betterments, the monthly payments, the $8 paid each member, and an amount for current operations, the balance remaining was divided among the members and nonmembers in proportions equaling the dairy products delivered.

The by-laws provided that a member should receive back his $100 on withdrawing; that on expulsion he should receive his proportionate share in the net worth of the creamery; that on death the member's estate should be paid the worth of the share, such worth to be determined by the directors. Thus, except in case of death or expulsion, a withdrawing member would receive the $100 paid in by him and the creamery would retain any increase in its capital assets derived from its operations.

In 1931 the Legislature repealed the sections of the Civil Code under which the creamery had been organized and provided that corporations organized under those sections would be deemed to have been organized under the general corporation laws of the state. (Stats. 1931, p. 1839.) The creamery

continued in business and did not change its methods of operation. It is clear that it was at all times attempting to operate as a nonprofit cooperative business association but was not a nonprofit marketing association as those organizations are now known.

Numerous members went out of the dairying business and others marketed their products elsewhere without withdrawing from the creamery and surrendering their certificates, thus retaining their voting rights. In January, 1944, there were 426 members with only about 150 of them delivering their products to the creamery and about 550 nonmembers delivering their milk and cream there. This situation caused internal dissension. Also after 1933, the creamery was compelled to pay federal income taxes.

In January, 1944, the board of directors, with the approval and written consent of two-thirds of the members reorganized the creamery into a nonprofit cooperative marketing association, which we will refer to as the association, under the provisions of chapter 4 of division VI of the Agricultural Code. No question is raised as to the regularity and legality of the reorganization proceedings.

Auditors for the creamery determined its net worth. By a method of accounting this was apportioned among the members so that the value of each member's share of the net worth was fixed at $1,065, for which amount credit was given to each member on the books of the association. No question is raised as to the correctness of the amount of these credits.

In the by-laws of the association two revolving funds were set up to retire this indebtedness. The first was called the ''Revolving Fund'' and was intended to retire $400 of this indebtedness to each member, the other was called the ''Secondary Revolving Fund'' out of which was to be paid the balance of $665 to each member. Interest could be computed and paid on the $400 but the by-laws are silent as to interest on the balance. There is testimony indicating that in setting up the financial affairs of the association it was intended that the indebtedness to each member of the creamery be paid in not more than ten years. There is also testimony to the effect that the members could not be paid in full without the dissolution of the association.

An initial payment of $100 to each member on account of the revolving fund indebtedness was offered at the time of the reorganization. This was refused by the plaintiffs and their assignors who brought this action to compel the asso-

ciation to pay each one of them the full amount of $1,065. Judgment went for defendant and this appeal followed.

The good faith of the association in proceeding to pay its indebtedness to its dissenting members is shown by a stipulation filed here on March 9, 1946, which recites that eleven of plaintiffs' assignors, subsequent to the judgment, voluntarily endorsed their membership certificates and elected to receive payments from the association upon their credits in the revolving fund; that during the years 1944, 1945, and 1946, each of them received payments totaling $300.

It is the theory of plaintiffs that they were forced out of the association by the reorganization; that they had a vested interest in its property of the value of $1,065 each; that the association appropriated these interests to its own use against their will and without their consent and without consideration to any of them; that this procedure violated section 16 of article I of the state Constitution and the Fourteenth Amendment of the federal Constitution.

In support of this theory it is argued that the plaintiffs and their assignors had a defined vested interest in the assets of the creamery; that the articles of incorporation and by-laws evidenced a contract between the creamery and themseleves (*Berkeley etc. Co.* v. *Kelly,* 78 Cal.App. 29 [247 P. 600]) ; that the terms of this contract cannot be violated by the creamery and the majority of its members; that ''A majority of stockholders have no right, directly or indirectly, to appropriate or divert to themselves assets of the company to the detriment of other stockholders'' (14 C.J., p. 866) ; and the ''minority stockholders may not lawfully be compelled to accept a change of investment made for them by others, or to elect between losing their interest and entering a new company.'' (*Geddes* v. *Anaconda C. Mining Co.,* 254 U.S. 590 [41 S.Ct. 209, 65 L.Ed. 425].) Numerous other cases are cited as supporting this argument. See *Whicher* v. *Deleware Mines Corp.,* 52 Ida. 304 [15 P.2d 610] ; *Jackson Co.* v. *Gardiner Inv. Co.,* (N.H.) 200 F. 113 [118 C.C.A. 287] ; *Meeker* v. *Winthrop Iron Co.,* 17 F. 48; *Koehler* v. *St. Mary's Brewing Co.,* 228 Pa. 648 [77 A. 1016, 139 Am.St.Rep. 1024] ; *Zabriskie* v. *Hackensack etc. R.R. Co.,* 18 N.J. Eq. (3 C.E. Green) 178 [90 Am.Dec. 617] ; *Johnson* v. *Goodyear Mining Co.,* 127 Cal. 4 [59 P. 304, 78 Am.St.Rep. 17, 47 L.R.A. 338] ; *Stanislaus County* v. *San Joaquin & Kings River C. & I. Co.,* 192 U.S. 201 [24 S.Ct. 241, 48 L.Ed. 406].

The foregoing arguments overlook two important and controlling facts.

First, plaintiffs and their assignors were not forced out nor were they expelled as that term is used in the by-laws of the creamery. They were given an option and might have continued as members of the association had they desired to do so. In that event they would have retained their full interest in its assets. Should they decide not to remain members they could receive the credit of $1,065 representing their entire interest in the assets of which $100 would be paid in cash.

As they had not been expelled and were living, all that any of them could demand on withdrawing from membership under the by-laws of the creamery was $100. On the reorganization each was offered immediate repayment of $100 and a credit of an additional $965 to be paid over a period of years. Thus under the reorganization plan each member will ultimately receive $965 more than he could have expected had the reorganization not been completed and had he withdrawn from the creamery.

Second, the argument of plaintiffs overlooks the power reserved to the state in section 1 of article XII of the state Constitution to alter from time to time or repeal laws for "the formation, organization and regulation of corporations and to prescribe their powers, rights, duties and liabilities and the powers, rights, duties and liabilities of their officers and stockholders and members." (See, §§ 362 and 362a, Civ. Code.) It is thoroughly established in California that these provisions of law form part of the contract between the corporation and its stockholders. (*Schroeter* v. *Bartlett Synd. Bldg. Corp.,* 8 Cal.2d 12 [63 P.2d 824].) The right of the Legislature under the constitutional reservation of power to amend the corporate laws and thus change the rights and liabilities of stockholders is well established. (See *Rainey* v. *Michel,* 6 Cal. 2d 259 [57 P.2d 932, 105 A.L.R. 148]; *Market Street Railway Co.* v. *Hellman,* 109 Cal. 571 [42 P. 225]; *Peterson* v. *Ball,* 211 Cal. 461 [296 P. 291, 74 A.L.R. 187]; *Farbstein* v. *Pacific Oil Tool Co. Ltd.,* 127 Cal.App. 157 [15 P.2d 766]; *Loney* v. *Consolidated Water Co.,* 122 Cal.App. 350 [9 P.2d 888]; *Heller Inv. Co.* v. *Southern T. & T. Co.,* 17 Cal.App.2d 202 [61 P.2d 807].)

There seems to be a dearth of decisions on the precise question presented here. While that exact question was not discussed it was held in *Driscoll* v. *East-West Dairyman's*

*Assn.*, 52 Cal.App.2d 468 [126 P.2d 647], that upon withdrawal of a member it was proper to withhold payment of proportionate assets from the member of a cooperative association until its dissolution.

Mr. Ballantine in his California Corporation Laws (1938 ed.) at page 9 in section 7, comments on the right of a corporation to change its financial structure as follows:

"Changes in the rights of outstanding shares may be valid if they can be justified as an exercise of fair business discretion in meeting the needs and exigencies of the corporate enterprise. The more urgent the need or the emergency the more drastic the amendment or adjustment which fairness will permit, as in changing preferences and financial arrangements according to what the enterprise can carry. The facts and circumstances of each case will enter into the determination of the validity of the exercise of the power in that case."

The evidence in this case indicates that the membership structure of the creamery had caused internal dissension and was hampering the corporation as well as compelling it to pay out unnecessarily, considerable sums in federal income taxes; that it was impossible to repay to members the full value of their interests without winding up its affairs. It also appears that all members were treated alike in the reorganization in so far as the valuation of the individual interests are concerned as well as the repayment of that valuation and that plaintiffs and their assignors, had they consented to the reorganization plan, would have received $100 in cash, which was the same amount they would have received from the creamery upon voluntary withdrawal from it, and in addition will receive $965 in deferred payments. There seems to be nothing unfair in this procedure and it is intended to settle the internal troubles of the association. This brings the case within the rule announced by Mr. Ballantine which we believe is a correct summary of the law applicable here. Certainly the reorganization plan did not violate any vested contract or property rights held by plaintiffs so it cannot be held to be unconstitutional on the grounds urged by them.

The attempted appeal from the order denying the motion for new trial is dismissed. The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 27, 1946. Edmonds, J., and Schauer, J., voted for a hearing.