The Pennsylvania Railroad Company et al., Appellants, *v.* State of New York, Respondent.

Third Department, January 11, 1962.

*Conboy, Hewitt, O'Brien & Boardman* (*Edward F. Butler* of counsel), for the Pennsylvania Railroad Company, appellant.

*Otto M. Buerger* (*William A. Colton* of counsel), for the Long Island Rail Road Company, appellant.

*Louis J. Lefkowitz, Attorney-General* (*Paxton Blair* and *Abe Wagman* of counsel), for respondent.

*Cravath, Swaine & Moore* (*Allen M. Merrill* and *William K. Davenport* of counsel), for Bankers Trust Company and others, *amici curiæ*.

Coon, J. Plaintiff, the Long Island Rail Road Company, is a railroad redevelopment corporation incorporated under article 7 of the Railroad Law. Article 7 (§§ 300–313) of the Railroad Law was enacted in 1954. (L. 1954, ch. 824.) It provided that certain domestic railroad corporations which could then or thereafter meet the conditions set forth in the act might qualify as a railroad redevelopment corporation. After qualifying, the corporation's existence, subject to certain exceptions not pertinent here, would continue for a 12-year period. (§ 303.)

Under section 307 of the 1954 act a railroad redevelopment corporation was authorized to make emergency changes in its passenger fares without prior approval by the Public Service Commission whenever it determined that its revenues would be inadequate during the following 12-month period to meet the

expenditures authorized by section 306 of the Railroad Law. Such changes were, nevertheless, subject to review by the Public Service Commission. Section 307 of the Railroad Law was amended by chapter 386 of the Laws of 1958 so as to require advance approval of the Public Service Commission before changes in existing fares could become effective. The validity of this 1958 act is challenged here.

It is the principal contention of plaintiffs that the right to make such emergency changes in fares without advance approval constitutes one of the provisions of a contract between plaintiffs and the State which culminated in the legislation of 1954, and that chapter 386 of the Laws of 1958, taking away from Long Island the right to make such emergency changes, unconstitutionally impairs the obligation of such contract. The complaint sought a declaration to that effect.

The complaint and annexed exhibits set forth in great detail the history of the financial plight of Long Island; the creation of the Long Island Transit Authority under chapter 361 of the Laws of 1951; the long negotiations which finally resulted in a " plan " for the rehabilitation of Long Island, the long-term payment of its debts, current financing of improvements, and an order of the Federal court terminating the bankruptcy proceeding for reorganization under section 77 of the Bankruptcy Act (U. S. Code, tit. 11, § 205), which had been previously instituted by Long Island.

In general the complaint alleges that Pennsylvania (which wholly owned Long Island) advanced very substantial immediate financial relief to Long Island; deferred payments and waived interest on a large existing indebtedness from Long Island to Pennsylvania; that certain banks made loans to Long Island, guaranteed by Pennsylvania, to help the rehabilitation of Long Island, and that all of this was in accordance with a " plan " which was agreed upon by Pennsylvania, Long Island and the Long Island Transit Authority; and, that the final result was the 1954 legislation, hence a contract between the State and the plaintiffs, which could not be constitutionally impaired by the subsequent legislation in 1958.

Of course this court must accept the allegations of the complaint as the facts for the purposes of the motion and upon this appeal. Doing so, however, does not abrogate the long established and strong presumption of constitutionality.

The court at Special Term has held that the act of 1958 was constitutional and valid. Two other decisions of the New York State Supreme Court have held that article 7 of the Railroad

Law (L. 1954, ch. 824) is a general law and not a private or local enactment. (*Gerosa* v. *Long Is. R. R. Co.*, 207 Misc. 360; *Klein* v. *Long Is. R. R. Co.*, 9 Misc 2d 486.) We agree that it is a general law and therefore not open to contract with any individual corporation or corporations. The fact that only one corporation, at the moment may meet the qualifying requirements, does not alter the type of legislation which encompasses any corporation which now or later may meet those requirements. There is nothing in the act itself (L. 1954, ch. 824) which binds the State or even suggests any contractual obligations on the part of the State, or that the State waived its powers to alter any corporate privileges therein granted. As stated in *Stanislaus County* v. *San Joaquin Canal & Irrigation Co.* (192 U. S. 201, 207–208): "There is no promise made in the act that the legislature would not itself subsequently alter that authority. * * * In order to make such a contract the language must be plain and susceptible of no other reasonable construction."

Moreover, assuming a contractual plan for the 1954 legislation, the State openly reserved the power to alter it under the "reserved power" found in section 1 of article X of the New York State Constitution, which says: "Corporations may be formed under general laws; but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." With this constitutional authority the Legislature has provided: "The charter of every corporation shall be subject to alteration, suspension and repeal, in the discretion of the legislature." (General Corporation Law, § 5.) These provisions were in full effect during all the preliminary steps leading to the 1954 legislation, were known to all parties, and became a part of the charter of the Long Island. (*Beloff* v. *Consolidated Edison Co. of N. Y.*, 300 N. Y. 11, 19.)

Under the reserved power noted, the Legislature could do anything that it could have done if the United States Constitution contained no provision prohibiting State legislation impairing the obligation of contracts, and such reserved power "prevents the charter from becoming a contract between the State and corporation protected from impairment by the Constitution." (*Matter of Mount Sinai Hosp.*, 250 N. Y. 103, 110; see *Matter of Roosevelt Raceway* v. *Monaghan*, 9 N Y 2d 293 [appeal dismissed for want of a substantial Federal question, 368 U. S. 12].)

Plaintiffs argue that the constitutional and legislative reservation was designed to overcome the " evils " of the *Dartmouth College* case (4 Wheat. [17 U. S.] 518), and to guard against the acquirement of perpetual corporate privilege, and therefore is inapplicable to a statute which limits the corporate existence to 12 years. But, whatever may have motivated the adoption of the reservation clauses quoted above, they contain no reference to perpetual grants and are not limited at all. The Legislature was thus empowered, without limitation, to determine that it was in the public interest to alter or revoke corporate privileges at any time.

It should be noted that the order and judgment appealed from decides only that chapter 386 of the Laws of 1958 is constitutional and valid. We may not be concerned with and do not decide the equities involved. We are concerned only with the lawful power of the Legislature. In reality all that act did was to require advance approval of the Public Service Commission as to the reasonableness of passenger fares instead of subsequent approval or disapproval of fares fixed by Long Island. The end result by either method is supposed to arrive at a fare which will enable the railroad to meet the expenditures authorized by the Legislature, without excessiveness. Although the fare has to be eventually approved by the Public Service Commission in either case, the plaintiffs contend that the delay in obtaining Public Service Commission approval is costly and detrimental to the " plan ". Nevertheless, the Legislature had the right to exercise the sovereign authority of the State (which was not relinquished under the 1954 act) to decide that the public welfare required advance approval of fares by a State agency.

The judgment should be affirmed, with costs to respondent.

HERLIHY, J. (dissenting). I agree with the majority opinion as to the facts and the allegations contained in the complaint but to have the matter in proper focus it is, in my opinion, necessary to elaborate on the facts to properly describe the background and the reasons for the passage of the legislation in 1954.

On March 1, 1949, the Long Island Rail Road, a wholly owned subsidiary of the Pennsylvania Railroad, filed a petition for reorganization under the Federal Bankruptcy Act which petition showed, among other things, that the Pennsylvania had a stock investment in the Long Island to the extent of $55,000,000 and a loan investment of $66,600,000, all of which was past due and further that the Pennsylvania was the principal creditor of the Long Island. After the petition was filed and on November 25, 1950, the Governor of New York, by executive

decree, created the Long Island Railroad Commission to safeguard the *public interests* of the citizens of this State in the reorganization and rehabilitation of the Long Island. At his request on March 30, 1951, the Legislature created the Long Island Transit Authority, to replace the commission, with power to make arrangements for private refinancing of the railroad or in the alternative for the Authority to operate the railroad. The Authority thereafter intervened in the bankruptcy proceedings and also in the proceedings instituted by the Pennsylvania before the Interstate Commerce Commission for a rate increase. In May of 1954, the Authority, in a long and detailed report, advised the Governor that it was unable to arrange financing sufficient to rehabilitate the Long Island; that the only method to achieve such result was by an agreement which it had proposed to the Pennsylvania; that it would eventually submit proposed legislation to carry out the terms of such agreement. Some of the proposals between the Authority and the Pennsylvania for the benefit of the Long Island Rail Road and to protect the interests of the public living on Long Island were:

(1) As to modernization of passenger cars " the Pennsylvania has acceded to our request that it do part of this  *  *  *  work in its own shops, and  *  *  *  at cost."

(2) " [T]he Pennsylvania is agreeing to furnish a large amount of new money [$5,500,000] in order to make possible extensive *other financing,* as well as by the omission of any payment to it for a period of years *of any return* on its existing investment in the railroad of over $100 million ". (Emphasis supplied.)

(3) " It is self-evident that the present plan is possible because the Pennsylvania is ready to cooperate fully with the State of New York through joining with the State in providing a modernized adequate railroad."

Thereafter the proposed legislation was submitted by the Authority to the Governor who summoned the Legislature into extraordinary session and submitted to it for its consideration the proposed legislation which was subsequently enacted into law, known as article 7 of the Railroad Law, and which became chapter 824 of the Laws of 1954. The Governor, when approving the law, stated: " It [this legislation] does so [rehabilitates] by the requirement that the Pennsylvania Railroad forego any return on its $100 million investment for a period of twelve years and through the Pennsylvania's agreement to advance $5.5 million in new funds as a down payment for the rehabilitation program." (N. Y. Legis. Annual, 1954, pp. 421, 422.) That

this was *extraordinary legislation*, intending to embrace contractual obligations, is evident from the preamble to the act.*

The record in the *Matter of Long Is. R. R. Co.* (122 F. Supp. 942) before Byers, United States District Judge, shows that "The plan was negotiated * * * between the Pennsylvania Railroad and the Long Island Transit Authority." At the same page the Attorney-General for the State concurred in the Authority's statement before the court.

Section 302 of the law provided that one third of the members of the board of directors should be residents of the counties served by the Long Island and section 304 required a consent by the stockholders and creditors which was filed by the Pennsylvania. A commitment by the Irving Trust Company was made to loan $15,000,000 to the Long Island, if it qualified as a railroad redevelopment corporation and upon so qualifying, the bank became bound to and did loan the money.

The law (1954) provided as an integral part of the financing program that a redevelopment corporation, in this case the Long Island, was authorized to maintain throughout the redevelopment period fares sufficient to carry out the improvement program and to repay the new loans. Any change in the scale of fares became effective *immediately* without approval by the New York Public Service Commission but subject to immediate review by it to determine the necessity of such increase (see § 307; L. 1954, ch. 824). The law further required the filing of monthly operating reports with the Public Service Commission.

---

* § 300. Legislative policy and purposes. It is hereby declared to be the policy of the state to encourage and bring about the rehabilitation, improvement, and continued operation by private enterprise of the facilities of any domestic railroad corporation which now or hereafter is a debtor in proceedings under the bankruptcy laws of the United States and which in the calendar year preceding the institution of such proceedings had passenger miles within the state of five hundred million or more, and to encourage and bring about the rehabilitation of such corporations in order to enable them, with private capital and under private management, to furnish safe, efficient, and adequate transportation service to the people of the state; and it is hereby further found and declared that the rehabilitation and continued operation of such corporations by private enterprise and enabling such bankruptcy proceedings to be terminated are matters of public concern; that it is necessary to create, with adequate safeguards, inducements, and opportunities for the employment of private investment in such rehabilitation and continued operation; that a railroad redevelopment corporation qualifying hereunder serves a public purpose; that provision must be made for the granting of partial tax exemption to such corporations; that the commission and any other state agency empowered to act under section three hundred three are hereby declared to be the agencies and instrumentalities of the state to carry out the policy and purposes herein recited; and the necessity in the public interest for the provisions of this article is hereby declared as a matter of legislative determination.

This procedure of prompt increase in fares was one of the essential inducements to the securing of new money for rehabilitation. The Attorney-General, in his brief on this appeal, concedes " that this right to make fare increases was surrounded from the start by safeguards against possible abuse."

In March of 1958 the Governor sent a message to the Legislature proposing that the above provisions be changed so that the Long Island would be required to follow the ordinary carrier procedure of first having approval by the Public Service Commission before any rate increase took place. Among other things, the Governor said in this message: "If the bill &ast; &ast; &ast; gives the Pennsylvania Railroad a basis for withdrawing from the arrangement which *was* entered into under the Railroad Development Act." (N. Y. Legis. Annual, 1958, p. 427.) *The performance by the Pennsylvania of its contractual commitment in 1954 made its position irrevocable in 1958.* The proposed legislation was passed and it is this legislation which is now in issue.

It has been necessary to go into this detailed statement of the facts in order to properly present the entire transaction. They could be summarized by stating:

1. The Long Island was in bankruptcy and the State was interested on behalf of the public to either enlist private capital to rehabilitate it, or for the Authority to take over the railroad and its operation.

2. The Authority negotiated with the Pennsylvania on behalf of the Long Island and eventually worked out a rehabilitation plan, the State's part of which was the enactment of the Law of 1954.

3. After the passage of the law, to be in effect for 12 years, the Pennsylvania caused the Long Island to enter into an agreement with the Public Service Commission and the Long Island Transit Authority. Thereafter the Pennsylvania, in reliance upon the legislation, entered into the performance of its agreement to effectuate and put into action the rehabilitation.

4. In 1958 the Legislature amended the 1954 legislation as to immediate rate increases without approval of the Public Service Commission and provided that any increases thereafter be subject to the approval of this Authority.

5. There was no necessity, as demonstrated in this record, for such an amendment.

It is apparent that the extraordinary facts herein are not controlled by any decisions which have interpreted the " reserved power " under section 1 of article X of the New York State Constitution.

As to whether or not a contract has been created, each case must be considered in its own factual circumstances in an effort to determine the interests of the State and the allegedly aggrieved party. (See *Matter of Roosevelt Raceway* v. *Monaghan,* 9 N Y 2d 293, 324, appeal dismissed 368 U. S. 12.) In the case of *New Jersey* v. *Yard* (95 U. S. 104, 114) the court said: " [T]he greatest trouble we have had on this point [as to the existence of a contract] has been in regard to what may be called legislative contracts * * *. [A] legislative enactment, in the ordinary form of a statute, may contain provisions which, when accepted as the basis of action by individuals or corporations, become contracts between them and the State * * * [A]nd when the supposed contract exists only in the form of a general statute, doubts still recur, after all our decisions on that class of questions."

In the case of *Dodge* v. *Board of Educ.* (302 U. S. 74, 78) the court stated: " In determining whether a law tenders a contract to a citizen it is of first importance to examine the language of the statute."

It is significant in this case that there is no formal contract document signed by or on behalf of the State and the Pennsylvania. However, I find no precedent which says that in order for the statute to be considered a contract, there must be a formal agreement. In considering the statute the facts and circumstances surrounding it must also be referred to in order to perceive the legislative intent. (See footnote, *supra.* )

The facts, as developed above, show conclusively that the State created a legislative authority to negotiate with the Pennsylvania for the rehabilitation of the Long Island to provide efficient passenger service for the benefit of the citizens of the State of New York. The Authority and the State promptly realized that the Long Island had no control over any rehabilitation program because it was wholly owned by the Pennsylvania and the Pennsylvania was the Long Island's chief creditor. It becomes thus readily apparent that the Long Island had to do whatever the Pennsylvania and the State decreed.

In this factual situation the respondent urges that the State only acted as an arbitrator between the Pennsylvania and the Long Island, but the record clearly indicates and shows that the Authority, on behalf of the State, was negotiating directly with the Pennsylvania and not with the Long Island. Furthermore, the Long Island had come under Federal jurisdiction and only the Pennsylvania could cause such jurisdiction to be withdrawn and returned to the State agencies.

The needs of New York State were for efficient and safe passenger service from the Long Island. In order to provide this, the Long Island needed to have fresh money for the purchase of railroad cars and maintenance purposes. Efficient passenger service is clearly a benefit to the State. On the other hand, no one would put money into an insolvent railroad unless there was some guarantee of getting back such money. The Pennsylvania, already having over 100 million dollars invested in the Long Island, was the logical source of new money.

The result was that the Pennsylvania agreed, among other things, to advance more money to the Long Island, provided that the State would set up a system whereby the Pennsylvania would get back this *additional* investment. So, the State passed what on its face was a general incorporation law, limited in time, which, regardless of the form of the statute, the surrounding facts and circumstances clearly show was intended as an offer in accordance with the demands of the Pennsylvania. The Pennsylvania thereafter did perform its part of the bargain. It is sufficiently evident that the Pennsylvania offered to do certain things if the State would do certain things. The State performed by enacting the statute and the Pennsylvania performed by doing what it had offered to do, to wit, to waive its lawful right to collect interest on the Long Island indebtedness and to advance more money under the terms of the agreement.

Everything about the legislation (1954), its intent, its purpose, its manner of fulfillment, signified and verified a contractual obligation between the State and the Pennsylvania. The Transit Authority in its report to the Governor dated May 26, 1954, recommending the subsequent 1954 legislation stated: "The *plan* we (Authority) submit is one *we developed* and *proposed* to the Pennsylvania. But without *agreement* by the Pennsylvania it would be only another piece of paper". (Public Papers of Gov. Thomas E. Dewey, 1954, p. 138; emphasis supplied.) Said the Governor in a letter of transmittal dated June 7, 1954: " Finally, the legislation will have to be implemented by a certificate of approval from the Public Service Commission and the Long Island Transit Authority setting forth in detail the *terms of the agreement* and incorporating such safeguards as may be requisite in the public interest." (Emphasis supplied.) The certificate of approval of the Long Island as a railroad redevelopment corporation, dated August 12, 1954, between the Public Service Commission, the Long Island and the Authority stated this action was taken pursuant to the provisions of sections 301 and 303 of the Railroad Law. We thus have

an implied in fact contract which is completely executed on both sides.

The question then is whether or not the State has the *power* to unilaterally change the terms of this contract with the Pennsylvania.

Special Term concluded that since the statute was an incorporation statute that it was and remained "subject to the reserved power of the State to amend or repeal". Without going into the history of the "reserved power" in regard to corporate charters and such power in regard to the Long Island, it has been held that such "reserved power" "prevents the charter from becoming a contract between State and corporation protected from impairment by the Constitution." (*Matter of Mount Sinai Hosp.*, 250 N. Y. 103, 110.)

Note, however, that in this case we are not concerned solely with a statute which is a charter but also with an implied in fact contract between the State of New York and the Pennsylvania. It is a contract which is limited to a total of 12 years by the terms of the State's offer. I am unable to find any decisions which hold that the "*reserved power*" *operates upon valid contracts made by the State with third persons.* (See *Coombes* v. *Getz*, 285 U. S. 434.)

In *Lord* v. *Equitable Life Assur. Soc.* (194 N. Y. 212, 221–222) the court said: "In this state as in others the feeling was almost universal that there never should be another corporation [*Trustees Dartmouth Coll.* v. *Woodward*, 4 Wheat. 518] with powers beyond the control of the legislature * * * the legislature * * * made all charters subject to alteration in its discretion, and this became the permanent policy of the state when the Constitution of 1846 was adopted. Construction should accord with the broad purpose to remedy what was regarded as a great evil." Here, the right to immediately raise revenues was a specific assurance to the Pennsylvania, not to the Long Island, and therefore within the policy stated above. Insofar as a contract with the Pennsylvania is concerned, there appears to be no conflict between the "reserved power" and the right to contract.

Nor is the "reserved power" without reasonable limits as stated in *Lord* v. *Equitable Life Assur. Soc.* (*supra*, p. 237): "The principle * * * seems to be that the legislature under its reserved power may amend any charter in any respect that is not *fundamental* when the *object* of the corporation and property acquired by it are considered." (Emphasis supplied.)

In *Von Hoffman* v. *City of Quincy* (4 Wall. [71 U. S.] 535) the City of Quincy had issued bonds under statutes authorizing

the levy of a special tax upon property sufficient to pay the annual interest on the bonds. This tax was to be levied only for the purpose of paying the annual interest on these bonds. By a subsequent statute the city's taxing power was reduced. This left nothing for the payment of the interest after the current expenses of the city were paid. The court held that insofar as the subsequent law diminished the value of the bonds by decreasing the *security,* it impaired the obligation of a contract. At pages 553 to 554: " It is competent for the *States to change the form of the remedy,* or to modify it otherwise, as they may see fit, provided no *substantial right* secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which under the form of modifying the remedy, impair substantial rights. *Every case must be determined upon its own circumstances.* Whenever the result last mentioned [impairment of a substantial right] is produced the act is within the prohibition of the Constitution, and to that extent void." (Emphasis supplied.)

It is true that the Long Island is a railroad, the general object of which is to provide transportation, and that this amendment does not prevent or unduly stop the Long Island from providing transportation. However, this is a " rehabilitation " statute or charter and the object is to obtain money or as stated in section 300 of the Railroad Law " that it is necessary to create, with adequate safeguards, inducements and opportunities for the employment of private investment in such rehabilitation and continued operation ". It appears from the statute that the object of a " Railroad Redevelopment " corporation is to attract fresh money and establish financial stability for such corporation. An obvious fundamental aspect of such a corporation is the ability to meet its financial obligations as they come due, and the repealed legislation was a safety factor in guaranteeing such ability in emergency situations.

The Legislature, therefore, is without *power* to amend or alter this provision of the statute or charter.

A factual analysis here demonstrates that the result of these agreements kept the State from the necessity of entering into the railroad business and its accompanying financial and economic problems and in return for which it, among other considerations, agreed to the emergency rate increase as contained in section 307 of the law. *The 1958 amendment was a fundamental change in the terms of the original contract.*

As to the Pennsylvania, with which the statute represents a true contract, there is even less reason to allow such amendment under the " reserved power ".

Nor can it be said that this " amendment merely protects the rights of the public or the corporation, its stockholders or creditors, or regulates and controls the internal management of the corporation so far as it has relation to the State  *  *  * or concerns the policy of the State ". (*Breslav* v. *New York & Queens Elec. Light & Power Co.,* 249 App. Div. 181, 184–185, affd. 273 N. Y. 593.)

There appears to be no reason for assuming that the parties did not intend to eliminate any power of amendment by the 12-year limitation. It is quite obvious that the State could not secure " fresh money " without assuring the lenders that the money would be repaid within a reasonable period of time, here 12 years. Treating this as a contract between the Pennsylvania and the State there is no " reserved power " to be applied because it is not a " charter statute ".

There was no public necessity demonstrated in this record for the amendment of the law of 1954 and as to the plaintiffs herein, such a change was a *fundamental* and *substantial* change when the over-all objective of the original legislation is considered.

" The obligation of the contract ' is the law which binds the parties to perform their agreement.' [*Sturges* v. *Crowinshield,* 4 Wheat. (17 U. S.) 122.] The prohibition has no reference to the degree of impairment. The largest and least are alike forbidden. In *Green* v. *Biddle* [8 Wheat. (21 U. S.) 84] it was said: ' The objection to a law on the ground of its impairing the obligation of a contract can never depend upon the extent of the change which the law effects in it. Any deviation from its terms by postponing or accelerating the period of performance which it prescribes, imposing conditions not expressed in the contract or dispensing with those which are, however minute or apparently immaterial in their effect upon the contract of the parties, impairs its obligation  *  *  *. This is not a question of degree or cause, but of encroaching, in any respect, on its obligation — dispensing with any part of its force.' [*Planters' Bank* v. *Sharp,* 6 How. 327.] " (*Von Hoffman* v. *City of Quincy,* 4 Wall. [71 U. S.] 535, 552–553, *supra.*)

I am not implying that the " reserved power " under the Constitution should be altered by judicial interpretation but I do determine that in this case, the extraordinary enterprise entered into between the parties, including the State, was not within the contemplation of the " reserved power " clause. It is not con-

tended that the State or the public have been or will be harmed and the restriction of the law in duration of time and the admitted power of supervision which remains with the Public Service Commission is amply sufficient for the public protection insofar as the exercise of the police power of the State is concerned.

I conclude as to the Long Island, the 1958 amendment altered a fundamental aspect of the original contract and as to the Pennsylvania, there is no charter basis for the application of the " reserved power " clause between it and the State of New York and under the Fourteenth Amendment, the 1958 amendment substantially impaired the terms and conditions of the original contract.

Accordingly, I vote to reverse and grant judgment as demanded in the complaint.

BERGAN, P. J., GIBSON and REYNOLDS, JJ., concur with COON, J.; HERLIHY, J., dissents in an opinion.

Judgment affirmed, with costs to respondent.